IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

FILED

October 4, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| IN RE: BRITTANY SWANSON, A MINOR, | ) ) ) | **FOR PUBLICATION** |
| | ) | **FILED:  October 4, 1999** |
| TENNESSEE BAPTIST CHILDREN'S HOMES, INC., | ) ) | TIPTON CIRCUIT |
| | ) | |
| Appellee, | ) | Hon. Joe H. Walker |
| | ) | Judge |
| v. | ) | |
| | ) | Supreme Court |
| HARRY LEE SWANSON, | ) | No. 02S01-9810-CV-00103 |
| | ) | |
| Appellant. | ) | |

For the Appellant:

James H. Bradley
Covington, Tennessee

Webb A. Brewer &
Debra N. Brittenum
Memphis Area Legal Services, Inc.
Memphis, Tennessee
(Amicus Curiae)

For the Appellee:

H. William Scott, III
Brentwood, Tennessee

Frank C. Ingraham
Nashville, Tennessee

Paul G. Summers
Attorney General & Reporter
(Amicus Curiae)

Douglas E. Dimond
Assistant Attorney General
(Amicus Curiae)

Robert D. Tuke
Tuke, Yopp & Sweeney
Nashville, Tennessee
(Amicus Curiae)

**OPINION**

REVERSED AND REMANDED                                    BARKER, J.

This case concerns the termination of appellant Harry Swanson's parental rights over his biological child, Brittany Swanson, who is now nine years old and in the custody of the appellee Tennessee Baptist Children's Homes, Inc. (Baptist Children's Home). Although Mr. Swanson's parental rights were originally terminated by the Tipton County Juvenile Court, the circuit court of Tipton County denied the petition to terminate parental rights on an appeal by Mr. Swanson. The Court of Appeals reversed the decision of the circuit court and found that Mr. Swanson had "abandoned" Brittany because he had "willfully failed to support" her or "willfully failed to make reasonable payments toward [her] support" within the meaning of Tennessee Code Annotated section 36-1-102(1)(D) (1996). We hold that the statutory definition of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" is unconstitutional because it creates an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional. This presumption violated Mr. Swanson's federal and state constitutional right to the care and custody of his daughter. Accordingly, for the reasons discussed below, the judgment of the Court of Appeals is reversed, and this case is remanded to the circuit court for entry of an order returning custody to Mr. Swanson.

## BACKGROUND

Harry and Brigitte Swanson[1] were married in May 1989. Their daughter, Brittany Swanson, was born on June 10, 1990. Subsequently, the family lived with Mrs. Swanson's father, Jim Ellingburg, in Drummonds, Tennessee, a town located in Tipton County. Mr. and Mrs. Swanson separated in the summer of 1991, and Mr.

---

[1] Brigitte Swanson died in October of 1996. Her parental rights were never at issue in this litigation.

2

Swanson went to Memphis to work for Delta Airlines. Thereafter, he moved to Mississippi and lived there for a short time before moving to Missouri where he has lived since December of 1991. Mrs. Swanson moved from Tipton County to various places in Shelby County and Mississippi. Mr. Swanson attempted to maintain contact with his daughter during that time, but he testified that the child's mother refused to allow visitation. He also attempted to maintain relations by contacting Mr. Ellingburg, Brittany's maternal grandfather, but Mr. Ellingburg told him that he did not know the whereabouts of Mrs. Swanson or Brittany.[2]

On May 4, 1993, Brittany was placed in the legal custody of the Tennessee Department of Human Services ("DHS") after a dependency and neglect determination was made the juvenile court. Beginning in June of 1993, Brittany resided in foster care through placement by the Baptist Children's Home in the hope that Brittany would be reunified with her parents. In December of 1994, the goal of foster care was changed from reunification with her parents to adoption,[3] and in June of 1995, the Baptist Children's Home filed a petition for legal custody of Brittany. On August 1, 1995, the Baptist Children's Home obtained legal custody of Brittany from DHS by court order.

The Baptist Children's Home then filed a petition on January 25, 1996 to declare Brittany abandoned by her parents and to terminate their parental rights. The

---

[2] According to Mr. Swanson's present wife, Mr. Swanson placed over one-hundred phone calls to Mr. Ellingburg to discover the location of Brittany and her mother. Often, these phone calls were not answered.

[3] The case manager for Brittany testified that DHS had no record of support from Mr. Swanson. DHS had made no effort to locate Mr. Swanson in part because DHS had been told by Mrs. Swanson that he was deceased. This information was seemingly collaborated to some extent a false statement made by Ms. Swanson on a Mississippi marriage license application in September of 1992 to the effect that her previous marriage had ended in the death of her husband.

In March of 1993, two months before DHS was granted custody of Brittany, Ms. Swanson obtained an annulment of her marriage on the grounds that the she was not legally divorced from Mr. Swanson. Although DHS had a record of the annulment—and therefore must have known that accounts of Mr. Swanson's death were inaccurate—DHS still made no apparent effort to contact him.

3

petition alleged specifically that Mr. Swanson had "legally abandoned [Brittany] within the meaning of Tenn. Code Ann. § 36-1-102(a) in that [he had] willfully failed to visit or [had] willfully failed to support or to make reasonable payments toward [Brittany's] support for four (4) consecutive months immediately preceding the filing of [the petition]."   At the termination hearing, the representative from the Baptist Children's Home testified that he had no record of contact from Mr. Swanson prior to filing a petition to terminate his parental rights on January 25, 1996.  At one point, the Baptist Children's Home asked Mr. Ellingburg whether he knew the location of Brittany's father, but Mr. Ellingburg stated only that he thought Mr. Swanson was "somewhere in Missouri."  The Baptist Children's Home made no further investigation to locate Mr. Swanson in part "because Missouri's a big state," and they did not know where to search.  No one at the Baptist Children's Home asked Brittany's mother about Mr. Swanson's whereabouts.

Mr. Swanson learned of the termination proceeding through someone who saw the published notice in the newspaper.  When Mr. Swanson arrived in Tipton County, he learned that a default judgment had already been entered against him, which he appealed.  The circuit court entered an order setting aside the judgment and held that Mr. Swanson should be given an opportunity to contest the allegations of abandonment.

Subsequently, a hearing was held in the Tipton County Juvenile Court, wherein the court entered an order terminating the parental rights of Mr. Swanson.  Mr. Swanson appealed this termination order to the circuit court which held a hearing on the issue of whether he had abandoned Brittany.  The circuit court found no evidence that "he willfully abandoned his child under all the circumstances of this case," and it ordered that the case be remanded to the juvenile court for the placement of Brittany

4

with Mr. Swanson.  On appeal by the Baptist Children's Home, the Court of Appeals reversed the circuit court based upon its finding that Mr. Swanson had abandoned Brittany within the statutory definition of Tennessee Code Annotated section 36-1-102(1)(A).

### *"Willfully failed to support"*

In 1951, the General Assembly overhauled Tennessee's adoption laws and listed "abandonment" as a ground for termination of parental rights.  1951 Tenn. Pub. Acts, ch. 202 (codified as Williams Tenn. Code §§ 9572.15 to 9572.52 (Supp. 1952)).  The Act provided that:

> an abandoned child shall be any child under the age of eighteen years who shall be willfully abandoned at least four consecutive months immediately preceding institution of an action or proceeding to declare the child to be [an] abandoned child.

Id. § 2 (codified as Williams Tenn. Code § 9572.16(5) (Supp. 1952)).  The definition was amended in subsequent years.  In 1961, the General Assembly enacted the following provision:

> For the purpose of this chapter an "abandoned child" shall be:
>
> 1.  A child whose parents have willfully failed to visit or have willfully failed to support or make payments toward his support for four consecutive months immediately preceding institution of action or proceeding to declare the child to be an abandoned child;. . .

1961 Tenn. Pub. Acts, ch. 227, § 1 (codified as Tenn. Code Ann. § 36-102(5) (Supp. 1962)).  In 1978, the statutory definition was changed to provide as follows:

> Abandoned child means a child whose parents have wilfully failed to visit or have wilfully failed to support or make reasonable payments toward his support for four (4) consecutive months immediately preceding

5

institution of an action or proceeding to declare the child to be an abandoned child. For purposes of this chapter, a father who has wilfully failed to visit or wilfully failed to support or make reasonable payments toward the support of the child's mother during the four (4) months immediately preceding the birth of the child shall be deemed to have wilfully failed to visit or wilfully failed to support or make reasonable payments toward the support of said child. In no instance, however, shall a final order terminating the parental rights of a parent pursuant to this section be entered until at least thirty (30) days have elapsed since the date of the birth of the child.[4]

1978 Tenn. Pub. Acts, ch. 704, § 1 (codified as Tenn. Code Ann. § 36-1-102(1)(A) (1984)).[5]

These definitions applied only to proceedings to terminate parental rights filed in circuit or chancery courts. In 1970, the General Assembly enacted statutory definitions of abandonment for failure to support that were to be used in proceedings to terminate parental rights filed in juvenile court. These definitions tracked the language found in Title 36 of the Code. See 1970 Tenn. Pub. Acts, ch. 600, § 2 (codified as Tenn. Code Ann. § 37-202(7) (Supp. 1970)); 1978 Tenn. Pub. Acts, ch. 704, § 3 (codified as Tenn. Code Ann. § 37-1-102(1)(A) (1984)); Tenn. Code Ann. § 37-1-102 (b)(1) (Supp. 1994).

The courts of this state also articulated a standard that was used to determine "abandonment" in adoption cases. In 1959, the Court of Appeals held that trial courts were not bound by the statutory definition of "abandonment" when making such a determination in an adoption proceeding. The Court held that "'[a]bandonment imports any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child. . . .'" Ex parte

---

[4] In accord with the most recent version of the statute, see Tenn. Code Ann. § 36-102(1)(D) (1996), we use the term "willfully."

[5] This definition contained in the Tennessee Code sections on adoption was in effect just prior to the adoption of the new language in 1995. See Tenn. Code Ann. § 36-1-102(1)(A) (1994).

Wolfenden, 49 Tenn. App. 1, 5, 349 S.W.2d 713, 714 (1959) (quoting 1 Am. Jur. *Adoption of Children* § 42). This Court adopted an identical standard in In re Adoption of Bowling, 631 S.W.2d 386, 389 (Tenn. 1982).

To determine whether the parent's conduct had evinced "a settled purpose to forego all parental duties and to relinquish all parental claims to the child," the courts developed several factors: (1) the parent's ability to support the child; (2) the amount of support provided; (3) the extent and nature of the contact between the parent and the child; (4) the frequency of gifts; (5) whether the parent voluntarily relinquished custody of the child; (6) the length of time the child has been separated from the parent; and (7) the home environment and conduct of the parent prior to removal. See O'Daniel v. Messier, 905 S.W.2d 182, 187 (Tenn. Ct. App. 1995).

It was against this background that the legislature amended the adoption code in 1995. See 1995 Tenn. Pub. Acts, ch. 532 (codified as Tenn. Code Ann. §§ 36-1-101 to 36-1-206 (1996 & Supp. 1998)). Since the petition to terminate parental rights in this case was filed on January 25, 1996, this case is governed by the new adoption law enacted in 1995 and effective January 1, 1996. See Tenn. Code Ann. § 36-1-103(b) ("Adoptions and terminations of parental rights pending on January 1, 1996, and surrenders and consents executed prior to January 1, 1996, shall be governed by prior existing law."). Section 36-1-113 provides in relevant part:

> (g) Termination of parental or guardianship rights may be based upon any of the following grounds:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Id. § 36-1-113(g)(1). Also, section 36-1-102(1)(A) provides:

7

"Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;

. . . .

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

*(D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" mean that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;*[6]

(E) For purposes of subdivision (1), "Willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child; and

(G) "Abandonment" does not have any other definition except that which is set forth herein, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled;

Id. § 36-1-102(1)(A) (emphasis added).

---

[6] This provision specifically deleted any requirement for willfulness in the definition of "willfully failed to support" and "willfully failed to make reasonable payment toward such child's support."

The Court of Appeals determined that this case was entirely controlled by the statute, that the proof was clear and convincing regarding Mr. Swanson's non-support, and that it was therefore bound with regard to the result reached.[7] Mr. Swanson contends that the statutory definition of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" is unconstitutional because the definition contains no element of intent with regard to failure to support. He argues that the definition creates a conclusive presumption that a failure to provide monetary support for four months preceding the filing of the petition to terminate renders a parent unfit. He further argues that this presumption fails to comport with a parent's fundamental constitutional right to the care and custody of his or her children. See, e.g., Stanley v. Illinois, 405 U.S. 645, 650 (1972); Bond v. McKenzie (In re Adoption of Female Child), 896 S.W.2d 546 (Tenn. 1995).

Conversely, the Baptist Children's Home asserts that the Court of Appeals correctly construed the statutory definition of abandonment and correctly found that Mr. Swanson abandoned Brittany within the meaning of the statute. It also asserts that the statutory definitions of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" do not violate Mr. Swanson's fundamental right to parent his child.

Since the constitutionality of a state statute has been questioned, the Attorney General was requested file a brief and has done so. See Tenn. R. App. P. 32. The Attorney General asserts that the element of willfulness should be read into the

---

[7] The Court of Appeals noted the unusual circumstances of this case, particularly Mrs. Swanson's informing agencies that Mr. Swanson was dead, Mrs. Swanson's relocation with the child several times, and the lack of any attempt to contact Mr. Swanson during the initial proceeding to determine whether Brittany was dependent and neglected.

definition of "willfully failed to support." He contends that reading the element into the statutory definition avoids constitutional problems.[8]

The first issue we must address is whether it is appropriate to read an element of intent into the statutory definition of "willfully failed to support." It is abundantly clear from the language used by the General Assembly that it intended to limit the discretion of trial judges when making a determination as to whether abandonment has occurred. See Tenn. Code Ann. § 36-1-102(1)(G) (1996 & Supp. 1998) ("'Abandonment' does not have any other definition except that which is set forth herein, it being the intent of the general assembly to establish the only grounds for abandonment by statutory definition. Specifically, it shall not be required that a parent be shown to have evinced a settled purpose to forego all parental rights and responsibilities in order for a determination of abandonment to be made. Decisions of any court to the contrary are hereby legislatively overruled.").

Notwithstanding the plain language of the statute, Mr. Swanson and the Attorney General would have us read the word "willfully" into the definition of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support." They argue that the word "willfully" should be included in order to effectuate the intent of the legislature and in order to preserve the constitutionality of the statute.

We recognize that there are occasions in which it is appropriate to reject a literal reading of a statute when it would result in the statute being declared unconstitutional. State v. Hudson, 562 S.W.2d 416, 418-19 (Tenn. 1978); Kirk v.

---

[8] Two interested parties also filed amicus briefs in this Court. The Memphis Area Legal Services filed a brief in support of Mr. Swanson's position, asserting that the definition of abandonment is unconstitutional since it creates an irrebuttable presumption of unfitness. Robert Tuke, an attorney and member of the Commission to Study the Adoption Laws of the State of Tennessee created by the General Assembly in 1993, also filed an amicus brief. Mr. Tuke contends that this Court should construe the definition of "willfully failed to support" to contain a willfulness element; when so construed, according to Mr. Tuke, the statute is constitutional.

10

State, 126 Tenn. 7, 13, 150 S.W. 83, 85 (Tenn. 1911). Moreover, courts may supply words when reasonably called for. Metropolitan Gov't v. Poe, 215 Tenn. 53, 74, 383 S.W.2d 265, 274 (1964). Nevertheless, it is the prerogative of the legislature, and not the courts, to amend statutes. Manahan v. State, 188 Tenn. 394, 397, 219 S.W.2d 900, 901 (1949).

In this case, we find that it is inappropriate for this Court to supply the element of intent in the definition of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support." It appears to us that the definition was carefully crafted by the legislature against a backdrop of both judicial interpretation and legislative enactment. Throughout its forty-four-year history, the definition of "abandonment" as it pertained to failure to support always contained an element of intent or purposefulness. We cannot conclude that the legislature excluded the willfulness aspect of failure to support inadvertently or mistakenly, particularly in light of the legislature's pronouncement that the only definition of abandonment which should be applied is that which is included in the statute.[9] It is evident that the legislature consciously and deliberately excluded the element of intent. We therefore decline to read the statute as suggested by Mr. Swanson and the Attorney General, but instead we will construe its constitutionality as drafted and enacted by the General Assembly.

### Constitutionality of Tenn. Code Ann. § 36-1-102(1)(D)

---

[9] We note, as argued by the Attorney General, that other sections governing abandonment do contain the willfulness element. For example, a separate definition is given for "willfully failed to visit." That term "means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The Attorney General argues that since the willfulness element is included elsewhere in the statute, the General Assembly must have intended that it be included in the sections concerning "failure to support." However, it is just as possible that the legislature, by excluding the willfulness term from the definition of "failure to support," meant to define it differently.

11

Both the United States and Tennessee Constitutions protect a parent's right to the custody and upbringing of his or her child. Stanley, 405 U.S. at 650; Nale v. Robertson, 871 S.W.2d 674, 678 (Tenn. 1994). In Stanley, the United States Supreme Court held that an unwed father was entitled, as a matter of due process, to a hearing on his fitness as a parent before his children were taken from him. The Supreme Court has also emphasized that unwed fathers must seize upon the opportunity to shoulder significant responsibility for the child's rearing before due process rights are implicated. Once that opportunity has been seized, the child may not be removed in the absence of a finding of parental unfitness. Quilloin v. Walcott, 434 U.S. 246, 256 (1978). See also Caban v. Mohammed, 441 U.S. 380, 395 (1978) (holding unconstitutional a statute that distinguishes between rights of unmarried mothers and unmarried fathers because unwed fathers have a fundamental right to parent children when their identity is known and when they have manifested a significant paternal interest in their children).

Similarly, this Court has held that the Tennessee Constitution provides for a parental right to privacy to care for children without unwarranted state intervention unless there is a substantial danger of harm to the children. Hawk v. Hawk, 855 S.W.2d 573, 579 (Tenn. 1993).[10] This Court has also held that the State and federal constitutions require an unwed biological father's parental rights to be determined before the court may proceed with the issue of adoption. See Robertson, 871 S.W.2d

_____

[10] See also Lewis v. Donoho (In the matter of Bianca Arnesche Askew), 993 S.W.2d 1, 4 (Tenn. 1999) ("The magnitude of a parent's constitutional right to rear and have custody of his or her children would necessitate a clear finding of substantial harm."); Petrosky v. Keene, 898 S.W.2d 726, 727-28 (Tenn. 1995) (holding that if an unwed father has taken affirmative steps to develop a substantial relationship with his child, the state may not interfere except to protect the child from harm); Bond, 896 S.W.2d at 548 ("[I]n a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general 'best interest of the child' evaluation in making a determination of custody.").

at 678.[11]  It is therefore beyond question that before a parent's rights can be terminated, there must be a showing that the parent is unfit or that substantial harm to the child will result if parental rights are not terminated.[12]  Certainly, a parent who has abandoned his child, either by willfully failing to visit or by willfully failing to support, is unfit.  However, Tennessee Code Annotated section 36-1-102(1)(D) may be read to permit termination of parental rights even when the failure to pay support was not intentional.[13]

Since the statutory definitions of "willfully failed to support" and "willfully failed to make reasonable payment toward such child's support" in effect create an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional, we hold that those definitions are unconstitutional. The statutory definitions simply do not allow for the type of individualized decision-making which must take place when a fundamental constitutional right is at stake. Therefore, they impermissibly infringe upon a parent's right to the care and custody of his or her children.

---

[11]  In Robertson, this Court emphasized that the biological father had grasped every opportunity to develop a substantial relationship with his son and had accepted responsibility for his care and custody.  871 S.W.2d at 678.

[12]  We note in passing that the circumstances of Mr. Swanson's relationship to Brittany at her birth and for at least a year thereafter are different than the circumstances of the unwed fathers discussed in most of the cases.  Mr. Swanson was married to Brittany's mother at the time of Brittany's birth and was merely separated from her when he lost contact with Brittany.  He therefore stands in a stronger position than the unwed fathers who merely had an inchoate right to the care and custody of their children.  It is necessary for the unwed fathers to seize upon the opportunity to parent before their right to parent is entitled to due process protection.  See Lehr v. Robertson, 463 U.S. 248, 262 (1983).  Mr. Swanson's right to the care and custody of Brittany was not inchoate; it already existed because of his marriage to her mother.

[13]  We reject the contention contained in Mr. Tuke's amicus brief that at some point the fact that the child has been in the custody of a non-parent for a period of time means that a lesser standard can be applied in determining whether parental rights may be terminated.  Such a standard would increase the likelihood for delaying cases in order that the child remain in foster care.  We cannot approve of a standard that would potentially cause that result.

The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away. Stanley, 405 U.S. at 658-59; Bond, 896 S.W.2d at 548. As the Supreme Court noted in Stanley, a procedure which elevates a presumption over a requirement of proof of unfitness may be cheaper and easier to administer than an individualized determination, but it "needlessly risks running roughshod over the important interests of both parent and child." 405 U.S. at 658.

We further hold that only that portion of the statute contained at Tennessee Code Annotated section 36-1-102(1)(D), which includes the unconstitutional definitions, is hereby invalidated. Under the circumstances of this case, we are able to elide the unconstitutional portion of the statute, and the remaining provisions of the Act may be enforced. Our legislature has specifically declared that the provisions of the Tennessee Code are severable. Tennessee Code Annotated section 1-3-110 provides:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the code would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid, and the inapplicability or invalidity of any section, clause, sentence or part in any one (1) or more instances shall not be taken to affect or prejudice in any way its applicability or validity in any other instance.

We recognize that the legislature's endorsement of elision does not automatically make it applicable to every situation; however, when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion

14

omitted, then elision of the unconstitutional portion is appropriate. See State v. Tester, 879 S.W.2d 823, 830 (Tenn. 1994); State v. Murray, 480 S.W.2d 355, 356-57 (Tenn. 1972).

In this case, the unconstitutional definitions were but a small part of a large act overhauling this state's adoption laws. See Tenn. Pub. Acts, ch. 532. This Act was enacted after extensive study by the Commission to Study the Adoption Laws of the State of Tennessee. See S.J. Res. 17, 98th Gen. Assembly (1993). Given the breadth and scope of the act and the fact that the definitions of abandonment as related to failure to support were but a small portion of the Act, it seems apparent to us that the General Assembly would have enacted the Act notwithstanding the unconstitutional sections. We therefore determine that the unconstitutional definitions are properly elided.

Since the Court of Appeals applied the unconstitutional definitions in Tennessee Code Annotated section 36-1-102(1)(D) to determine that Mr. Swanson had abandoned Brittany, the judgment of the Court of Appeals is reversed. Until otherwise amended by our legislature, the definition that was in effect under prior law shall be applied.[14] Leech v. American Booksellers Ass'n Inc., 582 S.W.2d 738, 740 (Tenn. 1979) (holding that prior law is in full force and effect when an act is held unconstitutional); see also State v. Driver, 598 S.W.2d 774, 776 (Tenn. 1980).

When the appropriate standard is applied and the presumption of correctness is given to the circuit court's findings of fact, see Tenn. R. App. P. 13(d), it follows that

---

[14] We wish to make it clear that the definition previously in effect was the definition as it existed in 1994. Under the prior statute, the definition of "abandoned child" contained an element of intent both in failures to visit and failures to support. See Tenn. Code Ann. § 36-1-102(1)(A)(i) (Supp. 1994).

Brittany was not abandoned by her father.[15] We therefore conclude that Mr. Swanson's parental rights to Brittany should not be terminated, and we remand the case to the trial court for preparation and implementation of a plan returning custody of Brittany to Mr. Swanson. The trial court is directed to prepare a plan for Brittany's return which will minimize the trauma to the child by providing for her gradual return. The plan shall provide that she be returned to Mr. Swanson's custody no later than ninety days from the entry of the judgment in this case.

Costs of this appeal shall be paid by the appellee, Baptist Children's Home.

_____
William M. Barker, Justice

CONCUR:

Anderson, C.J.
Drowota, Birch, Holder, JJ.

---

[15] The circuit court found that Mr. Swanson had not willfully abandoned Brittany. The circuit court also considered the specific circumstances of this case and determined that returning custody of Brittany to her father would not cause substantial harm to her.