IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS NOVEMBER 7, 2002

IN THE MATTER OF L.J.C., A.L.C. AND J.R.C.
STATE OF TENNESSEE DEPARTMENT OF CHILDREN'S SERVICES V.
TABITHA STEWART

Direct Appeal from the Juvenile Court for Tipton County
No. J4427     William A. Peeler, Judge

No. W2001-01799-COA-R3-CV - Filed July 24, 2003

This is an appeal of a termination of parental rights. For the following reasons, we vacate the portion of the juvenile court's ruling finding Mother willfully failed to support her children and affirm all other findings of the court below, thus terminating Mother's parental rights.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Vacated in Part;
Affirmed in Part and Remanded

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Didi Christie, Brownsville, TN, for Appellant

Paul G. Summers, Attorney General and Reporter, Elizabeth C. Driver, Assistant Attorney General, Nashville, TN, for Appellee

OPINION

Facts and Procedural History

In 1994, Appellant T.S. ("Mother") surrendered custody of her three children. In March of 1994, a consent order was entered giving temporary custody of the oldest child, L.J.C. to her maternal grandmother. The record is not clear on the whereabouts of the father during this time frame, but it is clear that the father was incarcerated at some point and remained incarcerated until very early in 1995. It is also clear that upon his release from prison, he had nothing further to do with his children. In August of 1994, Mother brought her two youngest children, A.L.C. and J.R.C., to the juvenile court of Tipton County because she could not care for them and was living in a motel room. Mother felt that she was incapable of taking care of the children because of a recent surgery

and because she had no prospects of work or of a stable home while recovering. The juvenile court entered a protective custody order for the two children. On September 6, 1994, the juvenile court declared the two children to be dependent and neglected and placed them in the temporary legal custody of the Department of Children's Services (DCS) which placed them in foster care. Mother moved the juvenile court to return custody of the two younger children to her by petition filed on December 19, 1994 alleging that she could now provide a suitable home for the children. DCS initially saw progress toward its goal of reunification of the children with Mother, as on March 1, 1995, DCS report noted that Mother had a fully furnished apartment, had completed parenting classes and was attending meetings with counselors "faithfully."

However, while in DCS custody, it became apparent that A.L.C. had been sexually abused. During treatment, A.L.C. named Mother's boyfriend and later husband ("Boyfriend"), among others, as a perpetrator. When DCS learned that the oldest child, L.J.C., who had remained in her grandmother's custody for some time, was again living with Mother and Boyfriend, DCS petitioned the juvenile court for custody of L.J.C. L.J.C. was placed in the protective custody of the State by an order entered March 10, 1995.

On March 27, 1995, Mother again petitioned for return of the two younger children stating that she had established a stable home and had complied with the plan of care. Mother also asked that the matter of L.J.C. be consolidated with that of the two younger children. On April 15, 1995, a consent order consolidating and continuing the cases indefinitely was entered.

DCS continued to pursue a course of reunification. On September 6, 1995, a progress report showed that Boyfriend had moved away, but that, although there was no physical contact, Mother maintained telephone contact with him. DCS recommended that a "no contact order" be put in place against Mother and Boyfriend. DCS also recommended that Mother and the three children have unsupervised day visits. The report showed Mother's progress was "Favorable", the second highest rating on a scale of five possible ratings in the category of "Reducing Risks Requiring Placement in Custody" and that Mother had completed "Most Tasks" in regards to her compliance with the case plan. Care for the children continued with the ever present admonishment that the children were to have no contact with Boyfriend.

The progress report dated April 3, 1996, however, reflected a completely different situation. The report showed that DCS had received reports in January that Boyfriend was again staying with Mother. When confronted, Mother admitted that these allegations were true and that she was five months pregnant with Boyfriend's child. DCS gave Mother an ultimatum on February 28, 1996 , an ultimatum requiring Mother to choose either Boyfriend or her children. After receiving no reply from Mother, receiving additional reports of Mother's continuing contact with Boyfriend, and Mother's continued denial that Boyfriend abused A.L.C., DCS changed its goal from reunification to termination. DCS filed a petition for review and disposition on May 2, 1996 with its stated goal of adoption for the children. Sometime during this period, Mother married Boyfriend. On August 26, a plan of care meeting was held, and the report showed that Mother had "met very few of her obligations/responsibilities" under the plan and had not visited the children since July.

Mother contested the change of DCS' goal to adoption and after several continuances, a hearing was held on August 29, 1996. At this hearing, L.J.C.'s status was changed to that of a dependent and neglected child, but DCS's stated goal of adoption was denied with a further hearing on the issue set for March 13, 1997. A progress report dated March 5, 1997 shows that Mother and Boyfriend(now husband) had moved to Nashville but had since returned, that Mother had canceled several visits with the children citing the distance, and still denied that Boyfriend sexually abused A.L.C.. This report had Mother rated as "No progress" in the category of "Reducing Risks Requiring Placement in Custody" and having completed "No Tasks" in regards to the case plan. A later report dated April 23, 1997 showed that Mother and Boyfriend had a violent altercation and that Mother had subsequently filed for divorce from Boyfriend. A subsequent report stated that DCS had been informed that the divorce became final, but that no documents were presented. A hearing was held on July 31, 1997 in which DCS's request that the children remain in foster care and that the goal of DCS become adoption rather than reunification was granted. Mother's visitation with the three children was also suspended. The order reflecting this decision was entered on October 9, 1997.

Mother appealed this decision to the Circuit Court of Tipton County. In an order dated, January 12, 2000, the circuit court denied her appeal. This order contains the findings of the circuit court that Mother was, in January of 2000, again living with Boyfriend and had been doing so since his release from prison three months earlier. Mother testified that she divorced Boyfriend at the insistence of DCS. Mother testified that she was unemployed and had been unemployed for the previous two years and that she relied on Boyfriend to provide her a place to live and for other necessities. Mother also testified that she was unaware of any sexual abuse by Boyfriend against her children.

At some point during this time period, DCS became aware that L.J.C., the oldest child, also alleged that Mother's Boyfriend had sexually abused her. On October 17, 2000, DCS filed a petition to terminate parental rights against Mother and the children's biological father who had remained uninvolved throughout the entire time the children were in DCS custody. The petition alleged that under T.C.A. §§ 36-1-103(1)(A)(l) and 36-6-113(g)(1) father had willfully abandoned the children and failed to pay any child support. The petition alleged that Mother also willfully abandoned the children because in the four months prior to the juvenile court suspending her visitation with the children, she had six scheduled visits, of which she canceled two, did not show for one and was thirty minutes late for her last scheduled visit. Also the petition alleged that Mother had not paid any child support.

The next ground for termination alleged by DCS was that, under Tennessee Code Annotated § 36-1-113(g)(3)(A)(i-iii), the children had been removed from Mother for more than six months; the conditions which led to the removal of the children or other conditions which would cause the children to be subject to further abuse and which prevented the return of the children to Mother persisted; there was little likelihood that these conditions would be remedied at an early date; and the continuation of the legal parent and child relationship greatly diminshed the children's chances of early integration into a stable and permanent home.

DCS also alleged that under T.C.A. § 36-1-113(g)(2), Mother had failed to follow the foster care plan statement of responsibilities and that those responsibilities were reasonable and related to remedying the conditions which necessitated foster care placement.

DCS further alleged that termination of parental rights was in the best interest of the children under T.C.A. § 36-1-119(i)(1-9). The petition stated:

> [T]he Respondents . . . have failed to make such an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in either of their homes; that Respondents have failed to effect a lasting adjustment after reasonable efforts by available social services for such duration of time, that lasting adjustment does not reasonably appear possible; that the Respondents have not maintained regular visitation or other contact with the children; that there is no meaningful relationship established between the parents and the children; that the Court must consider the effect of change of caretakers and physical environment on the children's emotional, psychological, and medical conditions; that the mother has refused to leave an indicated sexual abuse perpetrator and the girls . . . both continue to express fear of him, and of living in their mother's home with him there, and that she has refused to leave him for any length of time; that the mother continues to rely on the perpetrator . . . her former husband, with whom she now resides, for her home and livelihood, and that such home is not a healthy and safe environment for the minor children; that the mother's refusal to admit to the sexual abuse, or believe her children, or support them effectively, precludes her from providing a safe and stable home, care and supervision for the children, and that the Respondents have failed to pay child support consistent with the child support guidelines promulgated by the Department . . . .

At the hearing on this motion, held February 21, 2001, the children's father did not contest the termination, and DCS's petition was granted as to him. Mother did contest the termination and a full hearing was held. DCS and the court appointed guardian ad litem supported termination. DCS presented six witnesses. DCS' first witness, M.C. Love, a family therapist at LeBonheur Center for Children and parents, testified that she had been seeing A.L.C. since 1995 and L.J.C. since September of 1996. Ms. Love testified that the intial diagnosis of L.J.C. was sexual abuse and neglect, and that physical abuse was also revealed in the course of treatment. The initial diagnosis of A.L.C showed sexual abuse and neglect. Ms. Love testified that the girls indicated that Boyfriend was the perpetrator of the sexual abuse on them. She further testified while the girls had made progress in recovering from the sexual abuse, that the lack of permanency was causing problems. As to the girls current home, Ms. Love testified that the girls were well adjusted, that they wished to stay in their current home, and that their foster parents wanted to adopt the girls, and that this would provide needed stability. Ms. Love's opinion of Boyfriend was that the children should not return to any home where he was living and that he should not be allowed even supervised visitation with them. Lastly, she testified that the girls call Mother by her first name most of the time, and call their foster parents "Mom and Dad."

DCS next called Gary Smithson, a licensed psychological examiner at Baptist Hospital in Union City who was treating the youngest child, J.R.C., and had been doing so for approximately four months before the hearing. Mr. Smithson testified that J.R.C. suffers from "major depression, recurrent, without psychotic features, and also oppositional defiant disorder." Mr. Smithson testified that J.R.C. had experienced problems at home minding his foster mother and at school including being suspended, put in detention, and being kicked off of his bus. Mr. Smithson, however, testified that he had seen some progress and that he would like to continue seeing J.R.C. Mr. Smithson testified that J.R.C.'s current foster mother was providing J.R.C. with a "good" environment. Mr. Smithson saw "every reason not to disrupt that" and that a disruption "would be catastrophic for him." Mr. Smithson testified that J.R.C. does not remember his mother and that the last contact had been a brief one approximately four years previously.

Next, DCS called Rosemary Noland, team leader of the Tipton County office of the Department of Children's Services. Ms. Noland testified about the history of DCS' involvement with the children. Ms. Noland also testified as to Mother's progress in meeting the requirements of the permanency plan put in place when DCS decided to change its goal from reunification to adoption. Ms. Nolan testified that despite somewhat sporadic attendance at counseling sessions, that in January of 1996, Mother had completed her parenting classes. Mother was making good progress in meeting the permanency plan goals and that DCS had recommended unsupervised visitation during the day with the children. Mother had presented documents to the Foster Care Review Board the previous September purportedly proving that her and Boyfriend were no longer together. However, in January, DCS became aware of Mother's ongoing relationship with Boyfriend. DCS also became aware of her subsequent marriage to Boyfriend and at this point decided that reunification was no longer an option because the perpetrator of sexual abuse of the daughters was living in the home. Ms. Nelson also testified as to the number of visits that Mother had with the children. Ms. Nelson testified that from January of 1997 until Mothers' visitation was suspended at the end of July, Mother had fifteen scheduled visits. One visit was canceled because of snow and ice, and of the other fourteen, Mother canceled or missed a total of five visits. Mother was fifteen minutes late on another occasion and thirty minutes late on her last visit on July 22, 1997. Ms. Nelson testified that Mother had thirteen different known addresses since the children were placed in State care. Ms. Nelson concluded that in her opinion Mother had not made any meaningful change in her life since DCS began working with her.

DCS next called Teresa Harris, the children's case manager at DCS. Ms. Harris testified that she had been assigned to the case sometime in 1999. She had visited Mother's home on January 12, 2001. Mother informed her that four people were living in the home - Mother, Mother and Boyfriend's daughter, Mother's sister and Mother's sister's husband. Mother also told Ms. Harris that she had started a job that very day. Ms. Harris related that when asked if Boyfriend was living in the home, Mother stated that he was not and that her attorney had asked that they separate in November of 2000.

Deborah Hudson, foster mother of L.J.C. and A.L.C. was DCS' next witness. Ms. Hudson testified that A.L.C. had lived in her home for almost seven years and L.J.C. had been there for six

years. Ms. Hudson testified that she loved the girls, they appeared to love her, and that she and her husband wished to adopt them.

DCS closed its proof by calling Kay Ellis, in whose home J.R.C. had been living for about a year. Ms. Ellis testified that J.R.C. was a very challenging child who had a wide range of behavioral problems. She further testified that she hoped that J.R.C. could stay with her as long as possible but that she did not feel she could adopt him because, as she stated, "I'm older and . . . . I wouldn't physically be able to go through the problems that [J.R.C.] has and see him through it." Ms. Ellis testified that her home is a therapeutic foster home and that she goes to monthly classes and takes other steps to maintain this classification. J.R.C., in Ms. Ellis' opinion, had shown improvement in the thirteen months at her house as a result of the stability he experienced. It was also Ms. Ellis' opinion that J.R.C. requires stability and that "lots" of change would not be good for him.

Mother began her proof by taking the witness stand. Mother testified that she had been living in a house for about four months with her daughter, sister, and sister's husband. She testified that she had divorced Boyfriend about a year before, and that he does come over to her house every other weekend for supervised visitation with his daughter. She testified that the supervised visitation was an agreement reached because she feared the possibility that her daughter would be snatched by Boyfriend because her sister had been snatched in similar circumstances when they were younger and that her previous husband had tried to snatch her other children. She testified that she had been unable to visit her children during the time between 1997 and 2000 while her appeal of DCS' change of goals from reunification to adoption was pending. Mother testified that she was seeing a counselor and had been doing so since October, but that she had not seen a counselor prior to that since 1996. Mother testified that since 1996 that she had never lived in housing unsuitable for her children and that during that period DCS had never expressed any concerns about her homes. She acknowledged that she had been told by DCS prior to the filing of the petition to terminate her parental rights that Boyfriend was not to live in her home and was not to be around L.J.C. and A.L.C. According to Mother, Boyfriend was currently living in Ripley, Tennessee with his mother. Mother testified that she was currently working two jobs -- one at a nursing home, and the other with a janitorial service apparently owned by her stepmother. She testified that she had not been working at the nursing home long and that she had been working at the janitorial service since the summer of the previous year.

On cross examination by DCS, Mother confirmed living at nine different addresses since 1994. Mother stated that she was working thirty hours a week at the nursing home and approximately fifteen or twenty at the janitorial service. Mother testified that her income for the previous year was $2500 to $3000 not including $400 per month in child support paid by Boyfriend. Mother stated that Boyfriend paid her child support and occasionally paid other bills. Specifically, Mother stated that Boyfriend sometimes paid her car note, and had done so the previous month. Mother stated that since their divorce she had been seeing Boyfriend and that he had been living with her "off and on." Mother testified that, currently, Boyfriend "never" spends the night at her home, and that she had not spent the night with him since the previous November. Mother said that the last

time she had talked with Boyfriend was a week before the hearing, but that she did not see him at times other than those involving his visitation with their daughter. Mother testified that she did not plan on resuming her relationship with Boyfriend and had not terminated the relationship because of the current court proceedings. Mother stated that she had terminated the relationship because she was thinking of her children, loved her children, and wanted them home. Mother stated that she "honestly" did not know whether Boyfriend had molested her daughter because her daughter had named "so many people" as the perpetrator. When asked why she did not stop seeing Boyfriend, Mother testified that the reason was their daughter. Mother testified that she had offered to pay child support to social worker Allyson Poynter but that she was told that the children were fine and to worry about herself. When asked what she had offered to pay, Mother said "anything they wanted me to pay." Mother testified that she was the author of a flyer being circulated that stated "Has the Department of Children's Services removed your children for no reason? They did mine." Mother testified that she believed what she said in the flyer–that DCS had removed her children for no reason. Mother stated that she believed this because she felt she had performed every task required by DCS including divorcing Boyfriend, but that her children were still taken away.

Mother put on one other witness, her younger sister, Tina Busby. Mrs. Busby testified that she had lived with her sister for the previous two or three years. She stated that Mother had been working and, as far as she knew, going to counseling sessions during the time she had been living with her. She testified that Boyfriend was not living in their home and that when he came over for "a couple of hours" visitation with his daughter, the Boyfriend and his daughter were never left alone. On cross examination, Mrs. Busby testified that Boyfriend had not spent the night with Mother for more than a year.

The trial judge ruled from the bench that Mother's parental rights should be terminated and later entered a written order reflecting this ruling on March 29, 2001. The trial court found that Mother wilfully abandoned the children. The court found that Mother's visitation amounted to more than token visitation, but that Mother did not pay any child support or other support in-kind for the children. The court stated that "the law does require the parent to tender some support and make some attempt to provide for the welfare of the children . . . and that the parent cannot sit back and wait for a Court Order to require her to pay." The trial judge found "that the evidence is clear and convincing that [Mother] has willfully abandoned said children . . . within the meaning of the existing laws of the State of Tennessee in that she has willfully failed to contribute to the support of said children."

The remaining portions of the trial court's order pertinent to this appeal read as follows:

[F]ailure to follow the Permancy Plan and the persistence of conditions alleged as aternate grounds . . . were proven by clear and convincing evidence by the Petitioner. The Court finds that [Mother's] main problem is [Boyfriend]. The Court finds that [Mother] was making progress and that the State of Tennessee was working toward unsupervised visitation and ultimately, reunification, when it was discovered that [Mother] continued to maintain a relationship with [Boyfriend]. The Court finds that [Boyfriend] is named as a perpetrator of sexual abuse on the minor

daughters, but that [Mother] not only resumed her relationship with him after he had been named as a perpretrator, but also married him. The Court finds that when it ordered visitation between [Mother] and the minor children cease, that the Court had no choice given the subterfuges that Ms. Stewart employed in order to resume her relationship with [Boyfriend]. The Court finds that [Mother] chose [Boyfriend] over reunification with her children.

The Court finds and believes that [Boyfriend] is still a part of [Mother's] life and that she had not ceased her relationship with him even how. The Court believes that this relationship that she has with him is a persistent condition that has not been remedied nor is it likely to be remedied in the future.

3. The Court further finds that [DCS] required permanency in living arrangements and that [Mother] has moved on at least thirteen (13) different occasions since 1994, that she has not established a permanent or semi-permanent living arrangement, and that this also constitutes a persistent condition that has not been remedied nor is likely to be remedied in the foreseeable future.

4. The Court finds that the girl's [sic] counselor, M.C. Love, believed that it would be detrimental to return the children to [Mother] and that Ms. Love was a credible witness. The Court further finds that Gary Smithson advocated against removing the child [J.R.C.] from his present home, and that Gary Smithson was a credible witness.

5. The Court further states that, upon request of the attorneys to interview the minor children, [A.L.C.] and [L.J.C.], as to their choice of residence, that he would not have done this but for the fact that the attorneys for the mother and the Guardian ad Litem and [DCS], requested this. The Court finds that the girls did testify to him that they did not want to be with their mother, they did not want to move from their present homes, and they did not even know what their mother looked like. Further, that the girls call their mother [Mother] and their foster parents Mom and Dad.

6. It further appears to the Court based upon all of the proof, that all of the children need permancy and finality and that years and years have gone by, and, in this case, said children have been in the foster care system . . . since 1994. Further, that, based upon the counselor's recommendations, and the Court's observations, the children need stability and this cannot be acheived in the home of [Mother]. The Court finds that [J.R.C.] will need special help for years to come and that he cannot obtain this from the home of his mother . . . . The Court finds that it would be devastating to return any of the children to the mother. The Court finds that the children need to be freed for adoption.

. . . .

8. The Court finds that, pursuant to Tennessee Code Annotated § 36-1-113(g)(3)(A)(i-iii), the children have been removed from the Respondent, [Mother], for more than six (6) months and the conditions which led to removal or other conditions which in all reasonable probability, would cause the children to be subjected to further abuse or neglect and which therefore prevent the children's return to the care of the Respondent . . . still persist; that there is likelihood [sic] that these conditions will be

-8-

remedied at an early date so the children can be returned to [Mother] in the near future; that continuation of the legal parent and child relationship greatly diminishes the children's chances of early integration into a stable and permanent home.

9. The Court finds that pursuant to [T.C.A.] § 36-1-113(g)(2), [Mother] has shown substantial noncompliance with the Foster Care Plan Statement of Responsibilities, (also called the Permanency Plan and the Plan of Care), which were reasonable and were related to remedying the conditions which necessitated foster care placement.

10. The Court finds that in terms of best interest, pursuant to [T.C.A.] § 36-1-113(I)(1-9), the Respondent . . . has failed to make an adjustment of circumstances, conduct or conditions so as to make it safe and in the children's best interest to be in her home; that she has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; that there is no meaningful relationship established between [Mother] and the children; that a change of caretakers and physical environment on the children's emotional, psychological and medical conditions would be detrimental to the children; that the mother does not have a healthy and safe environment for the minor children because of a continued relationship with [Boyfriend]; and she has failed to pay child support consistent with the child support guidelines.

Ms. Stewart timely filed an appeal to this court and presents the following issues on the briefs of the parties for our review:

     I.     That the trial court erred in finding that the mother had willfully abandoned the children.

     II.    That the trial court erred in finding that the mother failed to follow the Permanency Plan.

     III.   That the trial court erred in finding that persistent conditions have not be remedied nor will be remedied in the foreseeable future.

     IV.   That the trial court erred in finding that it is in the best interest of the children that the mother's parental rights be terminated.

**Standard of Review**

Pursuant to Tennessee Code Annotated section 36-1-113(c)(1)(2) (2001), termination of parental rights must be based on a finding by clear and convincing evidence that grounds for termination exist, and that such termination is in the best interest of the child. Since this case was tried by the trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. T.R.A.P. 13(d). "Where the trial judge has seen and heard the witnesses, especially if issues of credibility and weight to be given oral testimony are involved, considerable deference must be accorded those circumstances on review." *McCaleb v. Saturn*, 910 S.W.2d 412, 415 (Tenn. 1995) (citing *Townsend v. State*, 826 S.W.2d 434, 437 (Tenn. 1992)).

**Law and Analysis**

It is a well established premise that "[a] parent has a fundamental right to the care, custody and control of his or her child." *Dep't. of Children's Servs. v. Wiley*, 1999 Tenn. App. LEXIS 773, No. 03A01-9903-JV00091, 1999 WL 1068726, at *3 (Tenn. Ct. App. Nov. 24, 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). A parent's right to the care, custody, and control of his or her child is not absolute and may be terminated if justified by clear and convincing evidence under the applicable statute. *See In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (citing *Wiley*, 1999 Tenn. App LEXIS 773, 1999 WL 1068726, at *3 (citing *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982))). As stated, termination of parental rights must be based on a finding, by clear and convincing evidence, that the grounds for termination of rights have been established and that termination of parental rights is in the best interest of the child. T.C.A. § 36-1-113(c)(1) and (2). Clear and convincing evidence has been defined as evidence which "'eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence.'" *In the Matter of: C.D.B., S.S.B., & S.E.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000) (citing *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. Ap. 1995)). In addition, in order to terminate parental rights there must be a showing that the parent is unfit or that substantial harm to the child will result if the parental rights are not terminated. *In Re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999) (citations omitted). Tennessee Code Annotated section 36-1-113(g) (2001) sets forth the legal grounds upon which termination of an individual's parental rights may be based. "The existence of any one of the statutory bases will support a termination of parental rights." *In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (citations omitted).

Mother first contends that the trial court erred in finding that she had willfully abandoned the children. Mother argues that the trial court's reason for this ruling, namely that Mother did not pay any child support while her children were in State custody, was erroneous because she was indigent. Mother acknowledges that there has been no specific finding by a court that she was indigent, but points to several instances in the record where she suggests evidence of her indigence exists including her intake sheet at the LeBonheur Center for Children in Crisis in February of 1995 which listed her income as consisting of AFDC and food stamps. Additionally, Mother points out that she was appointed counsel at the various stages of the proceedings in juvenile court. Mother argues that since there was no specific finding by the juvenile court that she had the ability to support her children and that her failure to do so was willful, the trial court was in error to base a finding of abandonment on Mother's failure to provide child support. Mother points to *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995) for support. In that case, the court stated that "a parent's failure to support a child will not amount to abandonment when the 'parent is financially unable to render financial support.'" *Id.*

DCS counters that Mother testified that she had worked most of the time that her children were in State custody and that at the time of the termination hearing she was working two jobs. DCS points to the case of *State v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209 (Tenn. Ct. App. Oct. 31, 1997), *perm. to appeal denied* March 2, 1998, for support. In that case, this Court stated

"[w]e dare say that the support of one's children should not be conditioned upon whether one has been placed under a court order to do so."*Id.* at * 5.

 As we have previously stated:

> Under the provisions of section 36-1- 113(g)(1) of the Tennessee Code, termination of parental rights may be based upon a parent's abandonment of his or her child. *See* Tenn. Code Ann. § 36-1- 113(g)(1) (2001). Section 36-1-102 defines abandonment, in pertinent part, as:
>
> (1)(A)(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or make reasonable payments toward the support of the child;
>
> (B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;
>
> (C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;
>
> (D) For purposes of this subdivision (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means that, for a period of four (4) consecutive months, no monetary support was paid or that the amount of support paid is token support;
>
> (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation.
>
> Tenn.Code Ann. § 36-1-102(1)(A)(E) (2001).
>
> In *In re Swanson,* 2 S.W.3d 180 (Tenn.1999), the Tennessee Supreme Court found the above definitions of "willfully failed to support" and "willfully failed to make reasonable payments toward such child's support" to be unconstitutional because they "in effect create an irrebuttable presumption that the failure to provide monetary support for the four months preceding the petition to terminate parental rights constitutes abandonment, irrespective of whether that failure was intentional." *Id.* at 188. The *Swanson* court held that the definition as it existed under the prior statute should be applied until the legislature amends the statute. *See id.* at 189. "Under the prior statute, the definition of 'abandoned child' contained an element of intent both in failures to visit and failures to support." *Id.* at 189 n. 14 (citing Tenn.Code Ann. § 36-1-102(1)(A)(i) (Supp.1994)).

*In re D.L.B.*, No. W2001-02245-COA-R3-CV, 2002 WL 1838147, at *5 (Tenn. Ct. App. Aug. 6, 2002).

It is uncontroverted that Mother did not pay any child support. Mother testified that during the year of 2000, she had between $2500 and $3000 in income, a figure that did not include $400 a month in child support from Boyfriend for his and Mother's daughter. It appears that Mother was indeed indigent. Furthermore, DCS did not present any proof to the trial court that showed Mother was able to financially support her children in any way and did not do so. The above quoted statute contains an element of intent. We cannot say on the record before us whether Mother intended not to pay any child support or whether Mother simply found it impossible to pay any child support. Thus, we find a lack of clear and convincing evidence on this issue and vacate this portion of the trial judge's ruling.

Next, Mother contends that the trial court erred in finding that Mother failed to follow the permanency plan. Mother contends that she substantially complied with the permanency plan, i.e. she had "completed parenting classes, attended counseling and there was never any proof presented that she had not obtained suitable housing which would have been safe, clean, and appropriate for the children." DCS agrees that Mother was required to have "substantially complied" with the permanency plan, but contends that, as the trial court found, Mother did not do so.

The record before us shows that the permanency plan entered for A.L.C. and J.R.C. in August of 1994 required Mother to meet a number of responsibilities including the following: Establish a means of financial support through employment; obtain a psychological evaluation and follow through on its recommendations; progress and benefit from treatment as evidenced by maintaining stability for six months; participate and complete parenting skills training; keep all appointments or cancel and reschedule and be responsible for transportation; apply for public housing or locate other suitable housing; advise DCS of any changes in status or location before a move; home established must be safe, clean, have proper heating, plumbing, water, and bathroom facilities; provide a stable home for children. The Plan of Care for L.J.C. established in 1995 reflects the significant changes required by the revelation that Boyfriend had sexually abused A.L.C. Mother was additionally required to, among other requirements: live independently from the alleged sexual perpetrator, work in counseling regarding her role in the abuse and neglect, demonstrate a willingness to protect the children from future abuse, overcome her denial and acknowledge the abuse, accept the role she may have played in the abuse. A later plan of care dated September of 1997 shows a requirement that Mother attend long term intensive psychotherapy "with a focus on learning to develop truly supportive relationship so that she will not have to rely on men who are a potential threat to her children."

Our Supreme Court has held that the permanency plan requirements must be "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.2d 539, 547 (Tenn. 2002). In the case *sub judice*, the trial court specifically found the requirements of the permanency plan to be "reasonable" and that the requirements " were related to remedying the conditions which necessitated foster care placement." We do not find that the evidence preponderates against the trial court's ruling on this matter.

As to the issue of substantial noncompliance, as it is a question of law, we review it *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.2d at 548. The *In re Valentine* court found that "substantial" means "of real worth and importance," *Id.*, and, thus, "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* Our review of the record shows that, after a less than stellar beginning, Mother appeared to be doing quite well in meeting the requirements of the plan and had progressed to the point where DCS wanted Mother and the children to have unsupervised day visits by the beginning of 1996. Here, however, things took a drastic turn for the worst. The trial court found that Mother used "subterfuges" to resume her relationship with Boyfriend during this time in contradiction to the stated goal of protecting the children from an alleged sexual perpetrator, and when finally confronted by DCS, Mother admitted to being five months pregnant with Boyfriend's child. After an ultimatum was given to Mother, either the children or Boyfriend, Mother married Boyfriend. The trial court found that Mother's relationship with Boyfriend continued even at the time of the hearing in February of 2001. This finding is one that we must give "considerable deference" being that it is based, in large part, on the credibility of the witnesses before the trial judge. We do not find that the evidence preponderates against the trial court's finding that Mother did not meet this goal of the permanency plan which was stated "[t]he mother does not protect the child from sexual abuse in that: children are in contact with alleged sexual perpetrator." The permanency plan also required a stable home for the children. The trial judge made a finding of fact that Mother had moved thirteen times between 1994 and the time of the hearing, and, thus, had not provided a stable home. Mother acknowledged living at nine different addresses. The evidence also does not preponderate against this finding of the trial court. Additionally, Mother testified that she was attending counseling, at the time of the hearing in February 2001 and had been doing so for approximately four months, but that she had not attended any counseling before that since 1996. The plan of care clearly called for her to attend such counseling so that she would not rely on men who were a danger to her children. We find that this was a reasonable requirement related to remedying the conditions which necessitated foster care placement. Mother, by her own admission, was not in compliance with this requirement. Therefore, for these reasons, we find clear and convincing evidence of Mother's substantial noncompliance with the permanency plan, and we affirm the trial court's finding of termination of Mother's parental rights on this ground.

Mother next contends that the trial court erred in finding that persistent conditions have not been remedied nor will be remedied in the foreseeable future. Mother argues that her lack of suitable housing was the reason that the children were placed into DCS custody and that her relationship with Boyfriend is what prevented their early return. Mother argues that at the time of the hearing, she had divorced Boyfriend and that he was no longer residing with her.

This ground for termination of parental rights found by the trial court is set forth in the Tennessee Code at section 36-1-113(g)(3)(A) and reads as follows:

> The child has been removed from the home of the parent or guardian by order of a
> court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

We will take each of the requirements of the above statute in turn. It is uncontroverted that the children had been in the care of the state for more than six years at the time of the hearing, far longer than the six month requirement of the statute. Under subsection (i), the trial court found that there were two persistent conditions that would cause the children to be subjected to further abuse or neglect. First, the trial court found that Mother had not terminated her relationship with Boyfriend and that this relationship was a persistent condition likely to continue and to put the children in danger of further abuse. Second, the trial court found that Mother had moved thirteen times since placing the children in State custody and that this lack of stability was a persistent condition likely to continue and to put the children in danger of further abuse or neglect. We find that, on the record before us and the considerable deference we must give to the trial judge's rulings where witness credibility is involved as in both instances here, these allegations were proved by clear and convincing evidence. The same holds true for subsection (ii) in that the trial court found that it was not likely that either of these conditions would be remedied at an early date, and for the same reasons stated under our analysis of subsection (i) above, we agree with the trial court. Lastly, under subsection (iii), the trial court found that the continuation of the parent and child relationship would greatly diminish the children's chances of early integration into a safe, stable, and permanent home. The testimony and evidence contained in the record before us show, again, that the trial judge was correct in this holding. The girls testified that they wanted to remain with their current foster parents. Their foster mother testified that she loved the girls and that her and her husband wanted to adopt them. The girls have been in this home for more than eight years and the only thing "diminishing" their integration into this safe, stable, and permanent home is the continued parent and child relationship. J.R.C. is in a therapeutic foster home with a foster mother who is helpful for his many problems, but who testified that she felt her own age would prevent her from adopting J.R.C. because she could not physically handle the challenge he presents. Thus, again, the lack of finality in this matter is preventing J.R.C. from placement for adoption into a safe, stable, and permanent home. Having met all three of the statutory requirements, we find clear and convincing evidence in the record before us that the trial judge was correct in his holding that Mother's parental rights should be terminated pursuant to Tennessee Code Annotated section 36-1-113(g)(3)(A).

Finally, Mother contends that the trial court erred in finding that it is in the best interest of the children that Mother's parental rights be terminated. Mother argues that clear and convincing evidence of grounds for termination have not been established and, therefore, the best interest

-14-

determination was irrelevant. Because we have found that clear and convincing evidence does exist for termination of Mother's parental rights, this argument is not well taken. Our review of the record, and findings thereon, parallel the findings of the trial judge on this issue. These findings and the basis for them are quoted extensively above. Thus, we also find clear and convincing evidence that the termination of Mother's parental rights is in the best interest of these children and affirm the trial court on this issue.

## Conclusion

For the foregoing reasons, we vacate in part and affirm in part the judgment of the court below and remand for any necessary proceedings consistent with this opinion. Costs are judged against Appellant Mother for which execution may issue, if necessary.

_____<br>
ALAN E. HIGHERS, JUDGE