IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
NOVEMBER 3, 2004 Session

## IN THE MATTER OF S.L.R, ET AL., CHILDREN UNDER 18 YEARS OF AGE

**Direct Appeal from the Juvenile Court for Putnam County**
**No. 624-DCS     John Hudson, Judge**

---

**No. M2004-01565-COA-R3-PT - Filed December 28, 2004**

---

This case involves a lengthy and protracted attempt by the Department of Children's Services and numerous other social services agencies to assist the biological parents of five children with creating an acceptable environment for the children. After five years and repeated efforts, the Department of Children's Services filed a petition to terminate the parental rights of mother and father alleging the grounds of abandonment by failure to provide support, abandonment by failure to provide a suitable home, failure to substantially comply with the permanency plans, and persistent conditions. The department also alleged that termination of the parental rights was in the best interest of the children. Following a hearing on the petition, the juvenile court entered an order terminating the parental rights of the natural parents. The mother of four of the children and the father of all five children filed an appeal to this Court. After reviewing the entire record, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Elizabeth Earl McDonald, Sparta, TN, for Appellants

Paul G. Summers, Attorney General & Reporter, Douglas Earl Dimond, Senior Counsel, Nashville, TN, for Appellee

**OPINION**

## I. Factual Background and Procedural History

Cynthia Lynn Bradham Reynolds ("Mother"), presently twenty-six (26) years of age, and Ronnie Reynolds ("Father" or collectively with Mother, "the Reynolds"), presently fifty-eight (58) years of age, are married and lived together with five children. Mother and Father had four children during their marriage: S.L.R. (dob: 12/17/1997), S.A.R. (dob: 01/03/1999), D.K.R. (dob: 09/01/2000), and R.R. (dob: 08/28/2001). Father and his ex-wife, Lois Marie Murphy Reynolds ("Ex-Wife"),[1] had a child together, S.R. (dob: 12/10/1990), who also resided with Mother and Father. Mother is the stepdaughter of Father and the daughter of Ex-Wife. All of the Reynolds' children are classified as special needs children. The events in this case, as explained in the voluminous record, began in 1998 and culminated in 2004 with the termination of the parental rights of the natural parents. A multitude of state, private, and religious organizations played key roles in the events set forth in the following paragraphs.

The record begins in September of 1998 when Patsy Billings ("Ms. Billings"), an employee of the Putnam County Health Department, began working with the Reynolds' family following a referral made to the Department of Children's Services ("DCS") concerning the family. Ms. Billings entered the home in order to assist the family with learning basic housekeeping, hygiene, and parenting skills. When she made these visits to the home, Ms. Billings would find the home in deplorable condition. Ms. Billings observed that the children had poor hygiene and were improperly dressed; roaches were crawling throughout the house; old diapers with feces were lying throughout the home; a foul odor permeated the residence; the floors were filthy; and bottles containing soured milk were lying around. Ms. Billings observed the children wearing either "soured clothing" or nothing at all. She also noted her concerns about Mother and Father not changing soiled diapers frequently enough and the children developing diaper rash as a result.

Ms. Billings also found that the children were not receiving proper stimulation because they were being left in playpens without interaction. She wanted to refer S.L.R. to the Tennessee Early Intervention Services ("TEIS") program, but Father refused the service. Ms. Billings also counseled Father about smoking in the house around the children. She was concerned because R.R. had to be hospitalized for breathing problems and was taking breathing treatments. Apparently, these counseling sessions had little effect. When Ms. Billings made return visits to the home to check on the family's progress, she would find full ashtrays stuck under, or inside, the cushions of the sofa. She also noted that bugs were crawling inside the tubing of R.R.'s breathing machine, which prompted a session with Mother and Father on how to properly clean and store the machine. Over the course of several years, Ms. Billings worked with this family and made a total of 226 visits to

---

[1] On June 17, 2004, the Department of Children's Services filed a motion with the juvenile court requesting a termination of Ex-Wife's parental rights as to S.R. pursuant to Ex-Wife's surrender of parental rights on June 10, 2004. The juvenile court granted the motion and terminated Ex-Wife's parental rights as to S.R. Ex-Wife has chosen not to appeal this ruling by the juvenile court. Accordingly, Ex-Wife's parental rights are not considered on appeal.

the home. She stated that she went above and beyond her normal job duties in attempting to help Mother and Father remedy the situation.

Bill Thorp ("Mr. Thorp"), a case manager with Life Care Family Services, also began working with the family in 1998 following a referral to DCS concerning the Reynolds' family. Mr. Thorp helped the family locate agencies that could provide transportation, food, clothing, or any of the other basic necessities of life. Like Ms. Billings, he too made frequent visits to the home and reported similar findings. Mr. Thorp noted that, when he would make scheduled visits, the house would be "immaculate." However, when he dropped by unannounced he would find that conditions once again had worsened. During these unscheduled visits, Mr. Thorp reported soiled diapers lying on the floor; dirty dishes stacked up; ashtrays full of cigarette butts; and food scattered throughout the home. Mr. Thorp felt that Mother and Father loved their children and were bonded to them, but they were careless in parenting. For instance, S.L.R. would occasionally be burned by the cigarettes Father smoked, but Mr. Thorp felt this was done accidentally. Mr. Thorp continued to work with the family until March of 2000.

In July of 2001, Sharon Noonan ("Ms. Noonan"), a case manager with the DCS Child Protective Services ("CPS") division, was assigned to investigate a referral involving Mother and Father. She visited the home on July 19, 2001, and found that conditions had once again deteriorated to an unacceptable level. When she arrived, one of the children came to the door naked, and the parents were reluctant to let her in. Upon entering the home, she found broken eggs and spilled milk on the kitchen floor. When she began to leave, her "shoes were stuck to the floor and [she] could hardly get [her] feet up without getting [her] shoes off." She noted dirty clothes lying all over the house, a very bad odor throughout the residence, and observed unsanitary baby bottles lying around. When Ms. Noonan returned for a follow-up visit on July 23, 2001, she noted the house was "immaculate." ). During this latter visit, Ms. Noonan prepared a CPS Plan of Action, which Mother signed, calling for the home to be kept clean.

On January 22, 2002, Ms. Noonan once again responded to the Reynolds' home to investigate yet another referral. Ms. Noonan observed one child running around naked; trash, food, and cigarette butts on the floor throughout the house; roaches crawling on the floors and walls throughout the house; dirty dishes all over the kitchen; the commode and bathtub were in deplorable condition; and soiled clothes and bed linens piled four feet high in one room. Ms. Noonan noted that S.A.R. had dried feces on her bottom and appeared to have not been bathed in several months. Ms. Noonan reported that R.R. was lying in a bassinet that was too little for him and his clothes were filthy. D.K.R. was in a playpen, and Ms. Noonan noted that she had an odor of "sour milk and poopie diaper." D.K.R. also appeared to have not been bathed for several months. Ms. Noonan instructed Mother and Father to remedy the conditions before she returned for a follow-up visit. On January 24, 2002, Ms. Noonan re-visited the Reynolds' home and entered into another CPS Plan of Action to address the cleanliness issue, which Mother also signed. At this point, Ms. Noonan contacted Family Support Services to come into the home on a weekly basis and ensure that the Reynolds' family was receiving all the services they needed. Ms. Noonan admitted that, after each Plan of Action was entered into, she would find the home clean on return visits.

In February 2002, Ms. Billings made another visit to the Reynolds' home to follow-up and check the family's progress. Ms. Billings arrived to find Mother and Father yelling at each other and the children all crying. The front window was broken out, and Mother stated that she broke it with her fist to keep from hitting Father. Mother further stated that Father had been cursing her and blaming her for DCS being called back into their home.

On February 24, 2002, DCS assigned Jennifer Fisher ("Ms. Fisher"), an investigator with CPS, to investigate another referral to the Reynolds' home. Ms. Fisher arrived at the home to find two police officers already present. The police officers had been called to investigate a report that a small child had wandered to a store three blocks away from the Reynolds' home near a busy highway. The officers identified the child, S.A.R., as one of the Reynolds' daughters and returned her to the residence. As she approached the Reynolds' house, Ms. Fisher noted the smell of stale urine, and she observed soiled diapers and underwear lying on the front porch. Mother met Ms. Fisher at the door and stated that she had been out looking for a new home and left Ex-Wife in charge of watching the children. When Ms. Fisher entered the home, she observed trash and debris throughout. The smell of urine also permeated the home's interior. Ms. Fisher saw dirty clothes, bedding, and trash covering the dining room table. When she entered the kitchen, Ms. Fisher observed used toilet paper with "brown stains" lying on the kitchen floor. Baby bottles with clabbered milk and cups littered the kitchen floor, and when she opened the refrigerator, she found rotting food and roaches inside. The kitchen sink and counter-tops were covered with dirty dishes, egg shells, trash, coffee grounds, and an empty baby formula can. Ms. Fisher noted that the stove, walls, counter-tops, and refrigerator were crawling with roaches.

Regarding the condition of the children, Ms. Fisher described the children as "dirty." She noted that their faces were caked with food and dirt, and she noted that the children's hair was matted and stiff with grime. R.R. was wearing a soiled diaper and appeared very dirty. The children also smelled of stale urine. While Ms. Fisher was at the Reynolds' home, S.A.R. once again ran out the door toward the street. At one point S.A.R. went into the roadway, and Ms. Fisher watched Mother drag her by the arm back to the house. Ms. Fisher noted that S.L.R.'s eye was matted with a yellow discharge. After observing these conditions, Ms. Fisher documented the condition of the home with photographs and called her supervisor. DCS filed a Petition for Temporary Custody with the Juvenile Court of Putnam County that same day, as well as an Affidavit of Reasonable Efforts made by DCS up to that point in time. The juvenile court entered a Protective Custody Order finding probable cause that the Reynolds' children were dependent and neglected, and the court placed the children in the temporary custody of DCS for foster home placement. The court also appointed a guardian ad litem to represent the children.

After removing the children from the home, Ms. Fisher took the children, accompanied by Mother and Ex-Wife, to the police department to await the arrival of the foster parent. Ms. Fisher noted that Mother and Ex-Wife did not appear to have any control over the children. While they were waiting, the police officers brought the family something to eat. When they were done eating, Ms. Fisher observed that the floor was covered with food, and Mother made no attempt to clean up. One of the girls ran out the door and toward a busy street, but Mother made no attempt to go after

the child unless she was requested to do so. The girl also ran into the men's restroom and started playing in the toilets, all while Mother and Ex-Wife sat idly by. S.R. appeared to be visibly distraught during this ordeal, but Ms. Fisher noted that Mother made no attempt to comfort her son.

Devonna Walters ("Ms. Walters"), a case manager with DCS, also became involved with the Reynolds' family in February 2002 when she was assigned to be the home county case manager for the children. On March 21, 2002, Ms. Walters made a visit to the Reynolds' home to check their progress. The Reynolds were not home at the time, but Ms. Walters looked into the windows and observed food sitting out; dirty dishes piled up on the counter; and trash on the front porch. She documented the condition of the home during her visit by taking photographs, and she continued to work with the Reynolds. As part of her job duties, she is required to prepare Permanency Plans for children entering foster care. On March 22, 2002, Ms. Walters created a Permanency Plan for each of the Reynolds' five children. The Permanency Plans listed the dual goals of returning the children to the Reynolds' home and adoption. According to Ms. Walters, the dual goals were chosen because of the long, recurring pattern of behavior displayed by Mother and Father. The Permanency Plans called for Mother and Father to appropriately supervise their children; exterminate the roaches from the home; seek alternative housing to better accommodate a family of seven; have S.L.R. examined by a specialist and undergo speech therapy;[2] and for the parents to undergo parenting classes.

Mother and Father appeared to be making great strides toward achieving the goals set forth in the Permanency Plans. During the trial period, Ms. Walters explained how DCS provided Mother and Father with transportation to visitation and doctor's appointments; placed Child Health and Development ("CHAD") into the home to work with Mother and Father on child development issues; brought in TEIS to work with the family; and brought in Kids First to work with Mother and Father on reunification. Ms. Walters provided Mother and Father with a list of telephone numbers to different agencies that would help them achieve the goals set forth in the Permanency Plans. Father contacted an exterminator to come to the home and treat the roach problem. Ms. Walters took Mother to the Department of Safety to obtain a study guide so she could work toward getting her driver's license. Mother and Father completed the required parenting classes. Ms. Walters contacted an educational specialist and attorney with DCS to work on the children's unique educational needs. Ms. Walters was also able to get the children on a waiting list for day care services, and DCS was prepared to pay a majority of the cost for this service.

On April 11, 2002, Ms. Walters went to the Reynolds' home once again to check on their progress. On this occasion, she found the house to be very clean and documented the condition of the home by taking pictures. The juvenile court conducted a hearing that same day, and both parties stipulated that the parents had remedied the unsafe and unsanitary conditions in the home. DCS agreed to remove adoption as a goal of the Permanency Plans and focus solely upon reunification

_____

[2] S.L.R. was born with a facial deformity which caused her eyes to be far set. Ms. Billings had originally attempted to get Mother and Father to take S.L.R. to see a specialist regarding what could be done to remedy the condition. Mother did not want S.L.R. to undergo the surgery because, according to Mother, the doctor believed that there was a possibility S.L.R. would go blind.

of the children with their parents. The court ordered that the children were to remain in the custody of DCS, but the children may be placed back in the home for a ninety (90) day trial home visit. Kids Putnam, an early intervention program designed for kids with disabilities, sent Latonya Mott ("Ms. Mott") to work with Mother and Father during April 2002. Unfortunately, once the children returned to the home the cycle began anew. Upon visiting the home, Ms. Mott observed that conditions had deteriorated to their previous state. During the same period, Ms. Walters conveyed that on one occasion she transported Mother and Father to a local fast food restaurant where she observed roaches crawl out of Father's coat and across the table. She also observed roaches come out of Father's clothes on another occasion while taking the children to a doctor's appointment.

On May 20, 2002, Vickie Tower ("Ms. Tower"), a registered nurse with the Putnam County Health Department, visited the Reynolds' home. She noted that the children were very dirty and had a bad odor; Mother had one child outside and inappropriately dressed for the temperature; there was a foul odor throughout the home; food and trash were scattered on the carpet; and bugs were crawling throughout the house. Ms. Tower found ashtrays in the cushions and discussed with Father the need to not smoke in the house due to R.R.'s respiratory condition. She also counseled Mother and Father on changing the children's diapers more frequently due to diaper rash.

On May 23, 2002, Ms. Walters went to S.A.R.'s school. Just before the children took their nap, the teacher would have them remove their shoes and socks. On this particular day, the teacher noticed that S.A.R.'s sock was sticking to the bottom of her foot. The classroom nurse examined S.A.R.'s foot and noticed an untreated burn. Ms. Walters took photos of S.A.R.'s foot, and the school nurses treated the burn. Ms. Walters spoke to S.L.R. about S.A.R.'s burn, and S.L.R. informed Ms. Walters that S.A.R. had gotten into trouble at home and Mother had put S.A.R. on the counter where her foot touched the hot stove eye. Ms. Walters then proceeded to the Reynolds' home. She informed Mother of the burn on S.A.R.'s foot, but Mother denied any knowledge of the burn. According to Mother, S.A.R. burned her foot at school, and the teacher failed to call Mother and tell her about it. While at the residence, Ms. Walters also noted that the conditions of the home had once again deteriorated, which she documented by taking pictures. She noticed what appeared to be diaper rash on R.R. that looked as if it were about to bleed. When she felt the child's diaper, it appeared to be wet and was sagging, so she instructed Mother to change the diaper in front of her. When Mother removed the diaper, Ms. Walters found a severe case of diaper rash covering R.R.'s entire genital area. Ms. Walters documented this with a photograph and instructed Mother to get the child medical attention. Mother stated that the diaper rash was caused by steroids passing an infection through R.R.'s bowels.

On June 18, 2002, DCS filed a Motion to Extend Trial Home Placement beyond the initial ninety (90) day period set by the court. As grounds for justifying an extension, DCS cited a return to the deplorable conditions observed in the home on previous occasions. On June 24, 2002, the guardian ad litem filed a Motion to Terminate Trial Home Visit citing the failure of the parents to get timely medical care for S.A.R.'s burn for nearly two weeks and a return to the unsanitary conditions. On June 25, 2002, Ms. Walters returned to the Reynolds' home for another follow-up visit. When she arrived, S.L.R. answered the door, and Ms. Walters observed a burn on the child's

arm. Mother was unable to offer an explanation for how S.L.R. was burned, but S.L.R. stated that she burned her arm on the stove. Ms. Walters also noticed a cut to D.K.R.'s eye that was bleeding and appeared to have started bruising. Mother stated that D.K.R. scratched her eye on a nail. Upon further examination, Ms. Walters noticed a car seat with a considerable amount of blood on it, which Mother explained by stating she had cut her hand on an ashtray in the car. Ms. Walters asked to see the cut, but Mother could not locate it.

Ms. Walters advised the parents to take D.K.R. and R.R. to see a doctor, but she learned on June 26, 2002, that the parents had yet to seek medical attention for the children. DCS filed a Motion to Terminate Trial Home Visit with the juvenile court on June 26, 2002. The juvenile court entered an order that same day terminating the trial home visit as of that date.

On August 22, 2002, the juvenile court held a hearing on the motions filed by the guardian ad litem and DCS. Following the hearing, the court entered an order upholding its prior decision to terminate the trial home visit. The court also implemented a visitation program in the Reynolds' home, whereby the children were allowed to spend from 3:00 p.m. Tuesday to 8:00 a.m. Thursday with Mother and Father. During the same month, DCS provided the family with hygiene and cleaning supplies, as well as safety equipment to protect the children. Ms. Walters stated that, when she took these supplies to the family, she also spent time teaching them how to use them. The goal, according to DCS, was to make another attempt to reunite the children with Mother and Father.

Also in August 2002, Mother and Father rented a larger home from Rebecca Iaquinta ("Ms. Iaquinta"). Ms. Iaquinta stated that, on the second day the Reynolds' family occupied the house, DCS workers came to the home to pick up the children. Ms. Iaquinta stated that the house was very clean, other than a few unpacked boxes, because she had personally cleaned the home before the family moved in. She also stated that she observed Mother bathing two of the children and giving them fresh clothes the night before. Throughout the duration of her relationship with the Reynolds' family, Ms. Iaquinta also attempted to help Mother and Father by showing Mother how to clean, providing transportation, and helping Mother get her driver's license. During one session when Ms. Iaquinta was teaching Mother how to drive, Mother told her that Father had been "messing" with her since she was eleven years old. Ms. Iaquinta took Mother's statement to mean that Father had engaged in inappropriate sexual contact with Mother at an early age.[3]

On October 24, 2002, another ninety (90) day trial home visitation period was implemented by the juvenile court. On October 28, 2002, Carol Stokesberry ("Ms. Stokesberry"), a licensed therapist, and Callie Lane ("Ms. Lane"), both employees of Therapeutic Interventions, Inc., began working with the Reynolds' family on reunification. On their first visit, the family was given personal hygiene items and told the proper way to use the items. On their second visit, Mother and Father were given budgeting materials along with a calendar to help them keep appointments.

---

[3] Mother was the step-daughter of Father at the time of this alleged abuse. At the time, Father was married to Ex-Wife.

Mother missed an appointment with Ms. Stokesberry, but she explained that DCS had called her to their office on the same day she was scheduled to meet with Ms. Stokesberry.

On November 20, 2002, Ms. Walters once again visited the Reynolds' home. According to Ms. Walters, the conditions of the home in November 2002 had deteriorated to a level worse than in June 2002 when the first trial home visit was terminated. Ms. Walters also took photographs during the visit to document the condition of the home. On November 20, 2002, Ms. Walters filed another motion with the juvenile court to terminate the home visits, stating that Mother and Father were missing scheduled appointments; Mother admitted to her that she was driving the children with only a learner's permit and without another licensed driver in the vehicle; soiled clothes were lying throughout the home; several aerosol bottles were lying within easy reach of the children; the children had contracted head lice; torn garbage bags and dirty diapers were scattered over the yard; and the fence had a gap through which the children could get through. The juvenile court entered an order that same day terminating the second trial home visit.

On February 2, 2003, the juvenile court appointed Child Appointed Special Advocate ("CASA") to act on behalf of the children. CASA assigned Loretta Williams ("Ms. Williams") to the Reynolds' children, and she observed their interaction with the foster parents. CASA filed several reports with the juvenile court after being assigned to the case outlining the children's progression in foster care.

In March 2003, Father telephoned Ms. Walters and informed her that Mother had been arrested for writing worthless checks. Following Mother's arrest, the gas and electricity were turned off at the home, and Father remained there by himself. When Ms. Iaquinta went to check on Father, she found a sight all to familiar to those who have dealt with Mother and Father in the past. Upon opening the door to the home, Ms. Iaquinta stated that roaches jumped onto her face. After entering the home, she observed Father sitting in a chair with fast food wrappers all around him; food on the floor; dirty dishes piled up; and dirty laundry stacked in piles. She called Adult Protective Services for assistance, but Father refused the offer of help. Ms. Iaquinta then proceeded to wash thirty loads of laundry for Father. She also looked under the bathroom sink and found it packed full of dirty feminine hygiene products, and she found dirty diapers shoved into a hole in a baby's mattress.

Between April 25, 2003, and June 30, 2003, Ms. Stokesberry was asked to evaluate the Reynolds' family and provide a recommendation. Ms. Stokesberry recommended that, while Mother and Father love their children, concerns about the children's welfare prevented her from advocating their return to the home. Ms. Stokesberry also recommended that Mother undergo a psychiatric evaluation. During one visit, Ms. Stokesberry noted that S.A.R. was sitting with Father in an inappropriate manner. As a result, Jennifer Hall ("Ms. Hall"), an investigator with CPS, conducted an investigation into the allegations of sexual abuse. She conducted an interview with S.A.R., during which S.A.R. stated that Father had "hurt her butt with his finger." S.A.R. then proceeded to pull down her pants and point to her vaginal area. Ms. Hall also interviewed both Father and Mother, but Father denied the allegations and did not offer an alternative explanation for the incident.

Ms. Hall presented her findings to two groups at DCS who found sufficient grounds to believe Father committed sexual abuse, and Mother had created a substantial risk of sexual abuse. Ms. Hall sent letters to Mother and Father notifying them of DCS's findings and included instructions on how to file for a review of those findings. According to Ms. Hall, Mother and Father never contested these charges. Following the alleged abuse, S.A.R. was taken to Our Kids for evaluation. Our Kids issued a report stating there was no medical evidence to substantiate a claim of sexual abuse, however, Our Kids declined to interview S.A.R. due to her age.

Given the failures by Mother and Father to comply with the original Permanency Plans, Ms. Walters created additional Permanency Plans, one for each child, on July 2, 2003, setting forth the sole goal as adoption. DCS felt that, even though Mother and Father had completed the parenting classes, they failed to implement what they had learned. The new plans did not list any specific criteria or goals that Mother and Father were required to satisfy. Instead, they simply stated that the sole goal was adoption of the children. DCS did, however, state in the plans that they would continue to make reasonable efforts to assist Mother and Father in completing the requirements from the March 22, 2002, Permanency Plans if they so chose. In addition, Ms. Walters explained the criteria for termination of parental rights to Mother and Father when she created the new plans, and both parents signed the document.

On August 8, 2003, Father filed a motion with the juvenile court to have the home visits reinstated. Father argued that he and Mother were working toward completing the goals of the permanency plans established by DCS and had established suitable housing for the children. DCS filed an answer to Father's motion denying that Mother and Father had made efforts toward completing the goals set forth in the permanency plans. On August 14, 2003, the juvenile court entered an order finding that Mother and Father were not in substantial compliance with the goals outlined in the permanency plans. Specifically, the court found that the parents had completed parenting classes, but they continued to neglect and failed to properly supervise their children. Pursuant to section 37-2-403 of the Tennessee Code, the juvenile court also ratified the July 2, 2003, permanency plans.

Also on August 14, 2003, DCS filed a petition with the juvenile court to terminate the parental rights of Mother and Father to their children. In the petition, DCS alleged that the following grounds supported the termination of parental rights in this case: (1) Mother and Father willfully failed to visit or support their children, other than during the trial home visits, since the children were placed in DCS custody on February 26, 2002; (2) Mother and Father abandoned the children by failing to make reasonable efforts toward providing a suitable home; (3) Mother and Father failed to substantially comply with the permanency plans; (4) the children have been removed from the home for more than six months, and the conditions leading to removal still exist. In addition, DCS alleged that it was in the best interest of the children that they not be returned to the custody of Mother and Father.

In September 2003, the Reynolds' case was turned over to Sherry Cowan ("Ms. Cowan"), an adoption case manager with DCS. Ms. Cowan met with Mother and Father on January 27, 2004,

and discussed with the Reynolds her concerns about Mother driving without a license. Ms. Cowan observed Mother driving to the visit and saw that her learner's permit had expired on October 23, 2003. Aware that Father could not obtain a license due to his poor eyesight, Ms. Cowan went to the Department of Safety and obtained information for Mother on how to secure a driver's license. When they met again, Ms. Cowan gave the information to Mother and explained what she needed to do to obtain a driver's license. On a subsequent visit to the Reynolds' home, Ms. Cowan discussed with the Reynolds the need for psychological and psychosexual evaluations. Ms. Cowan set up the appointments and offered them transportation, but Mother and Father never showed up. Ms. Cowan rescheduled the appointment for a later date, but the doctor informed Ms. Cowan that Mother and Father never made the second appointment either. Ms. Cowan also made sure that Mother and Father had an opportunity to visit with their children during this period of time. In visiting the Reynolds' home after taking over the case, she observed that, since the children have been removed, the Reynolds are able to keep the home clean and sanitary.

On January 27, 2004, Jeffrey Scott Herman ("Mr. Herman"), a licensed counselor with the Cookeville Medical Center, interviewed S.R. and S.L.R. at the request of DCS. Mr. Herman visited with S.L.R. for a brief time, but he continued to treat S.R. over a period of eight sessions. Mr. Herman diagnosed S.R. as having adjustment disorder. Mr. Herman filed a report with the juvenile court stating that during his sessions with S.R., who was thirteen (13) years old at the time, they discussed instances when both Mother and Father physically abused S.R. During one session, S.R. stated that Mother choked him and threatened to do so again if he told anyone. S.R. also described one instance when Father sent S.R. to retrieve a can of beer. When S.R. returned with a can of cola, S.R. stated that Father threw the full can of cola at him. During another session, S.R. indicated that his foster parents had spanked him, but Mr. Herman did not find S.R.'s story credible or that anything inappropriate occurred. Mr. Herman reported to the juvenile court that S.R. expressed the desire to be adopted rather than returning to Mother and Father.

The children's academic performance has started to improve since they have been removed from the custody of Mother and Father. Latrisha Smith ("Ms. Smith"), a special education teacher with the Putnam County School System, had S.L.R., S.A.R., and R.R. in her class while they lived with Mother and Father. When Ms. Smith was trying to potty train S.A.R., she requested that Mother and Father send three to four sets of clean clothes to school with S.A.R. The clothes she received were dirty, and she noted that the girls underwear sent by the parents contained dried feces. Ms. Smith also noticed that the children were wearing the same clothes for three or four consecutive days. When she did communicate with Mother and Father, Ms. Smith explained how they would call and curse her. Since the foster parents have taken custody of the children, their teachers report that the children are showing marked academic improvement.

On April 29, 2004, the juvenile court held a hearing on DCS's petition to terminate the parental rights of Mother and Father. In addition to hearing the above sequence of events conveyed by several witnesses presented by DCS, the court also reviewed a new Affidavit of Reasonable Efforts filed by Ms. Cowan and numerous exhibits documenting DCS's involvement with the Reynolds' family. In addition, the court heard testimony from Mother and several church friends

of the parents. The Reynolds' friends testified that the church has provided, and will continue to provide, assistance to the Reynolds' family. These witnesses offered testimony demonstrating that Mother and Father are loving and caring parents, and when they visited the Reynolds' home they found it to be neat and clean.

After hearing all the testimony and reviewing all the exhibits, the juvenile court entered a Final Decree of Guardianship on May 24, 2004. The juvenile court found that DCS had proven by clear and convincing evidence sufficient statutory grounds for termination of the Reynolds' parental rights and termination was in the best interest of the children. Both Mother and Father filed notices of appeal to this Court. Father presents the following issues for our review:

I.      Whether the trial court erred in finding that Mr. Reynolds willfully abandoned his five (5) children, thereby constituting a legal ground for termination of his parental rights; and
II.     Whether the trial court erred in ruling that Mr. Reynolds made no reasonable efforts to provide a suitable home, he and Mrs. Reynolds will not be able to provide the children with a suitable home, and the conditions leading to the children's removal still exist.

Mother presents the following issue for our review:

III.    Whether the trial court erred in finding that there is little likelihood that the conditions leading to removal will be remedied at a future date given the lack of a psychological evaluation performed on Mrs. Reynolds.

Father joins Mother in presenting the following issue for our review:

IV.     Whether the trial court erred in finding that the Department of Children's Services made reasonable efforts to reunite the children with Mother and Father.

The Department of Children's Services presents the following issues for our review:

V.      Whether clear and convincing evidence existed to support the trial court's decision as to each ground relied on by the juvenile court in terminating the Reynolds' parental rights;
VI.     Whether the Reynolds' argument that the Department of Children's Services did not exert reasonable efforts to reunite the children with the parents is without merit; and
VII.    Whether sufficient evidence existed to support the trial court's determination that termination of the Reynolds' parental rights was in the children's best interest.

For the reasons contained herein, we affirm the juvenile court's decision to terminate the parental rights of the Appellants.

## II.  Standard of Review

Both the United States Constitution and the Tennessee Constitution recognize that parents

have a fundamental right to the care, custody, and control of their children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Hawk v. Hawk*, 855 S.W.2d 573, 577 (Tenn. 1993); *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. Ct. App. 1999). This right, however, is not an absolute right immune from state involvement. *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1989). Termination of parental rights is governed by statute in Tennessee. *In re Z.J.S. and M.J.P.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *9 (Tenn. Ct. App. June 3, 2003). Section 36-1-113(g) of the Tennessee Code lists the statutory grounds warranting a termination of parental rights. Tenn. Code Ann. § 36-1-113(g) (2003).

A court of this state may terminate the parental rights of a parent if clear and convincing evidence exists showing that a statutory ground for termination exists and termination is in the child's best interest. *Santosky*, 455 U.S. at 769–70; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Drinnon*, 776 S.W.2d at 97; Tenn. Code Ann. § 36-1-113(c) (2003). The existence of any one of the grounds found in section 36-1-113(g) is enough to support a trial court's decision to terminate parental rights. *In re Valentine*, 79 S.W.3d at 546; *see also In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 475 (Tenn. Ct. App. 2000). This Court has explained the clear and convincing evidence standard as follows:

> The "clear and convincing evidence" standard defies precise definition. While it is more exacting than the preponderance of the evidence standard . . . it does not require such certainty as the beyond a reasonable doubt standard.
> Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.

*O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995) (citations omitted), *overruled on other grounds by In re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *see also Bingham v. Knipp*, Nos. 11281, 02A01-9803-CH-00083, 1999 WL 86985, at *3 (Tenn. Ct. App. Feb. 23, 1999).

We review a trial court's findings of fact in a parental termination case under the following standard of review:

> Because of the heightened burden of proof required by Tenn. Code Ann. § 36-1-113(c)(1), we must adapt Tenn. R. App. P. 13(d)'s customary standard of review for cases of this sort. First, we must review the trial court's specific findings of fact *de novo* in accordance with Tenn. R. App. P. 13(d). Thus, each of the trial court's specific factual findings will be presumed to be correct unless the evidence preponderates otherwise. Second, we must determine whether the facts, either as found by the trial court or as supported by the

preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights.

*In re M.J.B. & M.W.S., Jr.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004) (citations omitted); *see also In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *2 (Tenn. Ct. App. Nov. 25, 2003). We review a trial court's conclusions of law in a parental termination case under a purely *de novo* standard of review. *In re Valentine*, 79 S.W.3d at 547. We are also mindful that, being a non-jury case, the trial judge had the opportunity to observe the witnesses and gauge their credibility while they testified. "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Weatherford v. Weatherford*, No. W1999-01914-COA-R3-CV, 2000 WL 1891057, at *4 (Tenn. Ct. App. Dec. 29, 2000) (citing *Town of Alamo v. Forcum James Co.*, 327 S.W.2d 47, 49 (Tenn. 1959); *Sisk v. Valley Forge Ins. Co.*, 640 S.W.2d 844, 849 (Tenn. Ct. App. 1982)); *see also State v. Stewart*, 124 S.W.3d 609, 619 (Tenn. Ct. App. 2003).

The issues presented by the parties can be consolidated into two inquiries on appeal: (1) whether clear and convincing evidence existed to support the termination of the parental rights of Mother and Father based on one of the statutory grounds found in section 36-1-113(g) of the Tennessee Code, and (2) if so, whether such termination was in the best interest of the children.

### III. Statutory Grounds for Termination under § 36-1-113(g)(1)

On appeal, DCS argues that it proved each ground justifying the termination of the Reynolds' parental rights by clear and convincing evidence at trial. All of the issues presented by the parents on appeal argue to the contrary.

### A. Abandonment

Abandonment of a child by a parent constitutes a ground justifying termination of parental rights. Tenn. Code Ann. § 36-1-113(g) (2003). The petition filed by DCS alleged, as two separate grounds supporting termination of Father's parental rights, abandonment by Father in the following forms:

**VI**
**ABANDONMENT BY FAILURE TO VISIT OR SUPPORT**
Ronnie Reynolds [has] not contributed to the children's support since the children were placed in the Petitioner's custody on February 26, 2002, except for the period of time the children were on trial home visits.
. . . .
Ronnie Reynolds [was] advised on March 27, 2002 that willful failure to visit or contribute to the support of the children was grounds for termination of parental rights.

-13-

The Petitioner therefore avers that . . . Ronnie Reynolds [has] abandoned [his children] in that [he has] willfully failed to contribute to the support or make reasonable payments towards the support of said children for more than four (4) consecutive months prior to the filing of this Petition.

. . . .

## VII
## ABANDONMENT BY FAILURE TO ESTABLISH SUITABLE HOME

For a period of four (4) months following removal, the DCS has made reasonable efforts to assist parents . . . to establish a suitable home for the children, but the parents have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that it appears unlikely that . . . Ronnie Reynolds will be able to provide a suitable home for the children at an earlier date. Therefore, Petitioner avers that the Defendants . . . have abandoned [their children].

On appeal, Father argues that "abandonment" must encompass an analysis into a parent's ability to provide financial support. Father asserts that the evidence presented at trial established that both parents were disabled and only possessed the barest of means.[4] In addition, he directs our attention to the fact that the record is devoid of any evidence showing DCS petitioned the juvenile court for an award of support for the children.

In the portion of the order addressing the termination of Father's parental rights, the trial court made, in relevant part, the following findings:

> 17. The juvenile court found that the DCS made reasonable efforts *to prevent removal* of the children or the circumstances of the children's situation prevented reasonable efforts from being made *prior to the children's removal*.

---

[4] In presenting his second issue, Father outlines the family's income in his brief as follows:

It is also uncontroverted that the Reynolds have adequate funds to maintain a suitable home. Sherry Cowan's testimony (Adoption Case Worker for DCS) was that the Reynolds received $545.00 per month payments for the oldest child, [S.R.] as a result of his mother's disability, $408.00 each for both Ronnie Reynolds . . . and Cynthia Reynolds [sic] disability, $398.00 per month in food stamps and $242.00 from Families First in Putnam County, for a monthly, non-taxable income totalling [sic] over $2,000.00. Though the family has medical needs, some of a serious nature, all of the family members are on TennCare for hospitalization.

Father seemingly presents two contradictory arguments: (1) The parents were financially unable to provide financial support for the children while in DCS custody, but (2) they could financially support the children and provide a suitable home if the children are returned to their custody.

18. *Prior to the removal* of these children from their parents on February 26, 2002, the Department of Children's services made extensive reasonable efforts to prevent the removal of the children as is evidenced by the Affidavit of Reasonable Efforts.

19. The *reasonable efforts by DCS prior to removal* included Department of Health Home Nurse Visits and Child Health and Development (CHAD) services since September 1998, "Network" services since 1998, Advocacy Resource Corporation (ARC) services in the Spring of 2000, Tennessee Early Intervention Services (TEIS), Child Protective Services' (CPS) Plans of Action, CPS follow-up services July 2000 through January 2001 and Family Support Services (FSS) January and February 2002.

20. *For a period of four (4) months following removal*, from February 26, 2002 to June 26, 2002, *DCS made reasonable efforts* to assist the parents, Cynthia Lynn Bradham Reynolds and Ronnie Reynolds, to establish a suitable home for the children, but the *parents made no reasonable or sustained efforts to provide a suitable home and have demonstrated a lack of concern for the children to such a degree that it appears unlikely that Cynthia Lynn Bradham Reynolds or Ronnie Reynolds will be able to provide a suitable home for the children at an early date*.

21. The *reasonable efforts by DCS in the first four months* include Department of Health Home Nurse Visits, Child Health and Development (CHAD) services, Tennessee Early Intervention Services (TEIS), Kids Putnam, Parenting Classes through the Stephens Center, providing transportation to doctors' appointments, IEP meetings, visits, driver testing center and other appointments, Foster Mother's parenting mentoring assistance to Ms. Reynolds, Kids First services, DCS Case Manager, Educational Specialist and Educational Attorney assistance to parents with children's special education needs, placing the children back in the parents' home on a trial home visit and DCS case manager suggestions on keeping their home clean and obtaining medical care for the children.

22. The *lack of reasonable efforts by the parents . . .* included their not cooperating with service providers, not being home during scheduled visits by service providers, not consistently maintaining a clean and sanitary home, sending the children to school dirty and in dirty clothes, not obtaining necessary

-15-

medical treatment in a timely manner, leaving sippy cups and bottles out within reach of the children with clabbered milk in them and failing to change the babies' diapers frequently enough, all of which ultimately resulted in the Court terminating the [trial home visit] of the children in the parents' home on June 26, 2002, exactly four months after they were placed in DCS custody, despite efforts by DCS to maintain the trial home visit by first filing a motion to extend the trial home visit. Photographs taken on May 23, 2002 document the unacceptable condition of the home.

23. Therefore, the Court finds that . . . Defendants . . . have constructively abandoned [their children].[5]

24. DCS continued to make reasonable efforts to assist the parents . . . in establishing a suitable home for the children, in complying with the parents' responsibilities in the permanency plans and in alleviating the conditions that necessitated foster care and other conditions that prevent the return of the children to the parents, even after the Petition to Terminate Parental Rights was filed on August 14, 2003.

25. Some reasonable efforts by DCS continued up to the date of this hearing and included continuing Department of Health Home Nurse Visits, Child Health and Development (CHAD) services, Tennessee Early Intervention Services (TEIS), Kids Putnam, Advocacy Resource Corporation (ARC) mentoring for [S.R], overnight visitation with the children in the parents' home, transporting children from school to parents' home and back to school, providing Ms. Reynolds with driver study guide, purchase by DCS of cleaning supplies and safety equipment, weekly discussions by the DCS case manager about personal hygiene and house keeping, offer of marriage counseling, Therapeutic Interventions, placing the children on a second trial home visit, Vanderbilt Center of Excellence evaluation for [S.A.R.], Youth Villages Intercept in-home counseling for [S.A.R.].

26. The Court finds that the reasonable efforts by DCS, prior to removal and from removal to the date of this hearing, go above and beyond what is required and that [parents] have been offered or provided every reasonable service.

---

[5] By citing to the trial court's use of the phrase "constructive abandonment," we do not mean to imply that abandonment of that nature exists under the definition found in section 36-1-113(g) of the Tennessee Code. We merely make reference to it here for purposes of setting forth the trial court's treatment of the abandonment issue. Our treatment of the abandonment issue is discussed *infra*.

. . . .

46. Cynthia Lynn Bradham Reynolds and Ronnie Reynolds have not paid any portion of the children's substitute physical care and maintenance when financially able to do so.

47. DCS has proven all of the grounds set out in its Petition, except for abandonment by willful failure to support the children for the four months prior to the filing of the petition. DCS put on no proof as to this ground and conceded this ground. Both parents receive disability checks and even though their income is limited each could have supplied some *in-kind support* for the children, in the form of clothing and supplies, but failed to do so.

. . . .

1. That the Defendant, Ronnie Reynolds, Sr., has willfully abandoned the minor children . . . in that for the four (4) months following removal DCS has made reasonable efforts to assist the parent in establishing a suitable home for the children, *but the parent has made no reasonable effort to provide a suitable home and has demonstrated a lack of concern for the children to such a degree that it appears unlikely that he will be able to provide a suitable home at an early date*; that he has been substantially non-compliant with the statement of responsibilities in the permanency plans; that the children have been removed from the custody of the parents more than six (6) months; that the conditions that led to the children's removal still exist or other conditions exist which would in all probability subject the children to further neglect or abuse if returned home; there is little likelihood that these conditions will be remedied at an earlier date so that the children could be returned to the Defendant in the near future; that the continuation of the parent/child relationship greatly diminishes the children's chances of early integration into a stable and permanent home; and that it is in the best interest of the children that all the parental rights of said Defendant to said children be forever terminated; and that the complete custody, control, and guardianship of said children be awarded to the State of Tennessee, Department of Children's Services, with the right to place said children for adoption and to consent to said adoption in loco parentis.

Abandonment, as that term is used in section 36-1-113(g)(1) as a ground for termination of parental rights, is defined, in relevant part, as follows:

(1)(A) "Abandonment" means, for purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit[6] or have willfully failed to support[7] or have willfully failed to make reasonable payments toward the support of the child;

(ii) The child has been removed from the home of the parent(s) or guardian(s) as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) consecutive months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it

---

[6] A parent has "willfully failed to visit" his or her child when he or she "fail[ed], for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E) (2003). "'[T]oken visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(1)(C) (2003).

[7] A parent has "willfully failed to support" his or her child when he or she "fail[ed], for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D) (2003). "'[T]oken support' means that support, under the circumstances of the individual case, is insignificant given the parent's means[.]" Tenn. Code Ann. § 36-1-102(1)(B) (2003).

> appears unlikely that they will be able to provide a
> suitable home for the child at an early date[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i)–(ii) (2003).

We agree with Father that DCS failed to show by clear and convincing evidence that section 36-1-102(1)(A)(i) of the Tennessee Code was met in this case. The court below apparently held that Father abandoned his children by willfully failing to support them when, according to the juvenile court, he failed to provide "in-kind support." We cannot agree. The record is completely devoid, as the trial court correctly noted, of any evidence showing whether DCS petitioned for support payments. The record also reveals that none of the Permanency Plans drafted by DCS mention Father's responsibility to provide financial support to the children while they were in DCS custody, nor are we able to locate any order issued by the juvenile court instructing the parents to pay support.[8] *See In re M.J.B. & M.W.S., Jr.*, 140 S.W.3d 643, 654–655 (Tenn. Ct. App. 2004). The juvenile court recognized this failure on the part of DCS, but the court reached an incorrect result by relying on evidence that did not exist in the record. Accordingly, we find that the juvenile court erred in finding that Father willfully abandoned his children, as that term is defined in section 36-1-102(1)(A)(i) of the Tennessee Code.

Our inquiry, however, cannot end with the failure of DCS to properly prove abandonment under section 36-1-102(1)(A)(i) of the Tennessee Code. Father's position on appeal focuses entirely upon the definition of abandonment found in section 36-1-102(1)(A)(i), and he overlooks the fact that the definition of "abandonment" also encompasses situations where the parents "have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii) (2003). It is apparent from reading the trial court's additional findings that the court also applied the definition of abandonment found in section 36-1-102(1)(A)(ii) of the Tennessee Code. We find that the preponderance of the evidence supports the juvenile court's findings of fact relevant to the issue of abandonment. Additionally, those findings clearly and convincingly demonstrate that DCS made reasonable efforts to prevent removal prior to removing the children from the home. These findings also clearly and convincingly establishes that DCS made reasonable efforts for a period of four consecutive months following removal in assisting Father in creating a suitable home for the children.[9] As for the efforts made by

---

[8] We do not mean to imply that the juvenile court must order support before a parent incurs this obligation, nor do we imply that the obligation to support a child in DCS custody must be stated in every Permanency Plan. "In Tennessee . . . the obligation to pay support exists even in the absence of a court order to do so." *State v. Culbertson*, No. M2003-10700-COA-R3-PT, 2004 WL 865843, at *8 (Tenn. Ct. App. Apr. 21, 2004) (citing *State v. Manier*, No. 01A01-9703-JV-00116, 1997 WL 675209, at *5 (Tenn. Ct. App. Oct. 31, 1997)). In this case, however, we cannot say that Father willfully failed to support his children because the record is completely devoid of any evidence which would support such a conclusion.

[9] The Reynolds have also raised the issue of whether DCS engaged in reasonable efforts in attempting to reunite the Reynolds with their children. We discuss the reasonable efforts used by DCS in that regard below.

Father, the preponderance of the evidence supports the juvenile court's findings that Father did not engage in reasonable efforts. These facts clearly and convincingly demonstrate that Father has not made reasonable efforts to provide a suitable home, and he has demonstrated a lack of concern for his children making it unlikely that he will be able to provide a suitable home in the future. Accordingly, we affirm the trial court's finding that Father abandoned his children, as that term is defined in section 36-1-102(1)(A)(ii) of the Tennessee Code.

### B. Persistent Conditions

As an additional ground for supporting termination of the Reynolds' parental rights, DCS alleged in its petition section 36-1-113(g)(3), also known as the "persistent conditions" ground, which provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the following grounds:
> . . . .
> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (2003). In order to terminate parental rights based upon this ground, DCS must present clear and convincing evidence showing that each of these factors exist. *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002).

The juvenile court found, and the record clearly establishes, that the children have been removed from the home by court order since February 26, 2002, more than six months. Turning to the first statutory factor, the original conditions leading to the children's removal from the home was the arrival of Ms. Reynolds at the parent's home on February 24, 2002, to find that S.A.R. had been allowed to wander from the home, and the unsanitary condition of the home itself. Regarding the conditions necessitating removal, the juvenile court made the following findings:

> 38. The conditions which led to removal of the children from the home of [the parents] still exist and other conditions exist

which in all probability would cause the children to be subject to further abuse and/or neglect, making it unlikely that the children could be returned to either parent in the near future.

39. These conditions are that: [the parents] have failed to maintain a safe and sanitary home when the children are in the home; they have failed to properly supervise the children, placing the children at risk of harm; they have failed to obtain appropriate medical treatment for the children on a timely basis; [Mother] was recently incarcerated for writing worthless checks; despite many services provided by [DCS], including Child Health and Development Services, Therapeutic Interventions, Kids First and ARC, [the parents] have continued to grossly neglect their children when the children were in their care.

. . . .

50. The Court found the testimony of Rebecca Iaquinta to be very credible. . . .During a driving lesson, Ms. Iaquinta was discussing with Cynthia Reynolds how difficult it was for her having children at such a young age. Ms. Reynolds stated that Ronnie Reynolds, Sr. had been "...messing with me since I was 11 years old." Under the context of the conversation, Ms. Iaquinta believed that Ms. Reynolds was talking about sexual contact. The Court interprets Ms. Reynold's comment to mean that Mr. Reynolds had sexual contact with her beginning at the age of eleven. During her testimony, Cynthia Reynolds offered no testimony which would refute Ms. Iaquinta's interpretation of her comment. Ronnie Reynolds did not testify. Cynthia Reynolds was Ronnie Reynold's stepdaughter at the time the sexual contact purportedly occurred and resided in the home with him and her mother. DCS did not allege in its Petition that Ronnie Reynolds committed severe sexual abuse, however, his alleged sexual abuse of Cynthia Reynolds as a child certainly constitutes conditions which in all reasonable probability would cause the children before the Court at this time to be exposed to similar abuse or neglect, therefore, preventing the children's safe return to the parents. . . .

In her brief, Mother does not attack the juvenile court's findings as to this factor. Father, however, argues in his second issue on appeal that the parent's home is currently clean and suitable enough for custody of the children to be restored in the parents. Father argues that, if this were not true, DCS

would not have allowed the children to be placed back in the home for two trial visits. Father also states that the parents presently have suitable funds with which to provide for the children's needs.

The record is replete with evidence which demonstrates that, *every time* the children were returned to the parent's home, the conditions deteriorated to an unacceptable level. Additionally, the trial court was concerned with the potential for physical and sexual abuse to recur if the children were returned to the home.[10] Accordingly, we find that the preponderance of the evidence supports the trial court's factual findings regarding this factor. We further find that this evidence constitutes clear and convincing proof of "other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect." Tenn. Code Ann. § 36-1-113(g)(3)(A)(i) (2003); *see also In re S.Y., J.Y., and D.Y.*, 121 S.W.3d 358, 369 (Tenn. Ct. App. 2003) (stating that, even though present conditions have been remedied, "other conditions" may still exist which satisfy this factor).

We now turn to Mother's issue asserting that the juvenile court erred in finding that the remaining two elements in section 36-1-113(g)(3)(A) were present in this case. Regarding the second statutory element, the juvenile court made the following findings:

> 43. Cynthia Lynn Bradham Reynolds and Ronnie Reynolds' mental and/or emotional status would be detrimental to the children and/or prevent them from effectively providing care and supervision for the children.
>
> 44. Cynthia Lynn Bradham Reynolds and Ronnie Reynolds have failed to effect a lasting adjustment after reasonable efforts by available social agencies for such a duration of time that lasting adjustment does not reasonably appear possible.
> . . . .
> 48. The Defendants argued that the Court should consider the condition of their home now, even though the children are not in their home, and give them another chance to show that they can properly parent the children. The Court does not find merit in this argument and finds no reason to believe the children could be safely and permanently returned to the parents in the foreseeable future based upon the testimony of witnesses. . . .

---

[10] We are mindful that the record does not indicate whether Father was ever formally charged with either physically or sexually abusing any of his children. However, the record contains sufficient evidence to suggest that abuse was occurring. The evidence presented at trial also indicated that Father had an inappropriate sexual relationship with Mother, also his step-daughter, when she was a child. It was appropriate for the juvenile court to consider these facts in determining whether DCS carried its burden as to this factor.

In support of her argument that the juvenile court erred in so finding, Mother points to the fact that there was "no information concerning psychological intervention that could have made it possible for these children to be returned to the mother." Given the lack of such evidence, Mother argues that the juvenile court was without sufficient evidence with which to make a finding regarding the second element.

The evidence presented below clearly and convincingly shows that DCS has proven the second factor found in section 36-1-113(g)(3) of the Tennessee Code. The parents have engaged in a recurring pattern of allowing the home to deteriorate to abysmal conditions each and every time the children were in their custody. Although the parents completed parenting classes, the evidence presented at trial demonstrated that the parents have continuously failed to apply what they have learned. Mother and Father emphasize in their briefs that Father is disabled by poor eyesight which limits his ability to maintain the home. However, the testimony offered at trial by DCS overwhelmingly indicates that Father is able to participate to some degree in maintaining the home. Numerous social services personnel who visited the home stated that they had personally seen Father cleaning the house and children. Other witnesses conveyed that they had personally observed Father fixing cars and lawnmowers, painting, and giving directions while traveling in an automobile.

Mother argues that her failure to apply the skills she acquired during these parenting classes is due to her inability to learn these skills. Mother asserts that DCS failed to provide her with a psychological examination which would have identified this problem, and the record is devoid of any evidence regarding her mental status. For the reasons discussed below in our discussion of DCS's reasonable efforts in reuniting this family, we find Mother's argument in this regard to be without merit. We note here, however, that the evidence presented at trial also showed that the Reynolds' home would occasionally be "immaculate" when social services agencies returned to follow-up on their progress, which discredits Mother's assertion that her low mental functioning prevented her from keeping a clean home. Despite the lack of evidence as to Mother's mental abilities, the record contains sufficient evidence which clearly and convincingly supports the trial court's conclusion that, if the children were returned to the parents, the conditions which led to the termination of their parental rights would begin anew. *See State v. R.S.P.*, No. E2002-00442-COA-R3-JV, 2002 WL 31431496, at *4 (Tenn. Ct. App. Oct. 31, 2002); *In re Baker*, No. W1998-00606-COA-R3-CV, 1999 WL 1336044, at *4–5 (Tenn. Ct. App. Dec. 28, 1999).

Turning to the third statutory factor, Mother argues that the juvenile court erred in finding that "the continuation of the parent or guardian and child relationship greatly diminishes the children's chance of an early integration into a stable and permanent home." *See* Tenn. Code Ann. § 36-1-113(g)(3)(iii) (2003). In support of this argument, Mother asserts that DCS presented no proof that, if appropriate social services were provided to the family in the future, the children could not be safely returned to the Reynolds' home.

Mother and Father have had from 1998 to present to remedy the condition of the home. During this time, Mother and Father were unable to maintain the children's environment at an appropriate level, even with help from numerous social services agencies. We find no basis in

Mother's argument that these conditions will be remedied in the future. *See In re Baker*, 1999 WL 1336044, at *5. The juvenile court gave great weight to the credibility of the numerous witnesses presented by DCS, especially the children's teachers, representatives of various agencies, and mental health professionals, whose testimony indicated that continuing the parent/child relationship would be detrimental to the children's chances of success in achieving stability and permanency in the future. We find that the evidence contained in the record clearly and convincingly supports the trial court's finding that the third factor found in section 36-1-113(g)(3)(A)(iii) of the Tennessee Code has been satisfied.

## C.  Failure to Comply with the Permanency Plans

We also note that Mother and Father have intertwined, within the issues addressed above, another issue, even though it is not stated as such. The parents argue, in essence, that the juvenile court also erred in finding that the parents failed to comply with the Permanency Plans. Since we affirm the trial court's holdings regarding the grounds for termination discussed above, we do not need to discuss the merits of this issue. *See In re Baker*, No. W1998-00606-COA-R3-CV, 1999 WL 1336044, at *3 (Tenn. Ct. App. Dec. 28, 1999); *see also In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (stating that DCS must only prove one of the grounds found in section 36-1-113(g) of the Tennessee Code by clear and convincing evidence in order to justify termination of parental rights).

## D.  Reasonable Efforts by DCS

We now turn to the final issue raised by Mother and Father collectively in this matter. Both parents assert that the trial court erred in finding that DCS made reasonable efforts at reuniting the children with their parents. Before the parental rights of a parent may be terminated, the court must make the following finding:

> (a) At any proceeding of a juvenile court, prior to ordering a child committed to or retained within the custody of the department of children's services, the court shall first determine whether reasonable efforts have been made to:
> (1) Prevent the need for removal of the child from such child's family; or
> (2) Make it possible for the child to return home.
> (b) Whenever a juvenile court is making the determination required by subsection (a), the department has the burden of demonstrating that reasonable efforts have been made to prevent the need for removal of the child or to make it possible for the child to return home.

Tenn. Code Ann. § 37-1-166 (2003); *see also In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *5–8 (Tenn. Ct. App. Mar. 9, 2004). To aid the court in making this

determination, DCS is required by statute to submit an affidavit outlining the efforts made on its part in reuniting the family, which it did in this case. Tenn. Code Ann. § 37-1-166(c) (2003). The trial court's findings regarding the reasonable efforts made by DCS in this case have already been provided, in relevant part, above.

On appeal, Mother and Father argue that DCS failed to make reasonable efforts because Mother was never given appropriate psychological testing. DCS counters by asserting that this issue is without merit. The Reynolds argue that, had DCS done so, the department would have been able to (1) determine that Mother's limited psychological development was the reason she was unable to comply with the requirements of the Permanency Plan, and (2) provide Mother with additional assistance in order to meet the goals of the Permanency Plan, ultimately enabling the children to be returned to the home.

In support of this position, Mother and Father point to Mother's testimony at trial showing she did not graduate from high school and, while in school, was in special education classes. She also directs our attention to the fact that Ms. Stokesberry recommended that Mother undergo a psychological evaluation in May 2003, but this test was never performed. Additionally, Mother and Father assert that Ms. Walters never ascertained why Mother was not learning the parenting skills DCS required her to implement, and the Permanency Plans never mention Ms. Stokesberry's recommendation. In fact, Ms. Walters testified that she had no knowledge of Ms. Stokesberry's recommendation. It was not until Ms. Cowan took over the case, and shortly before the petition to terminate parental rights had been filed, that she asked Mother to undergo a psychological evaluation.

As additional support for their argument, Mother and Father rely on our holding in *In re M.E., M.E., R.B, M.B. S.B.*, No. M2003-00859-COA-R3-PT, 2004 WL 1838179 (Tenn. Ct. App. Aug. 16, 2004). In that case, DCS provided the parent with a psychological evaluation, but they failed to follow up with counseling. *Id*. at \*10. In finding that DCS failed to make reasonable efforts, we stated:

> Here, the record shows that the Department provided numerous
> services; however, those services were of little consequence due to
> the Department's failure to provide the most critical, indeed the most
> obvious service required by Mother, psychological counseling.

*Id*. We find that this holding is not controlling in this case. Ms. Cowan admitted at trial that she wanted Mother to undergo a psychological evaluation because of Mother's apparently low mental functioning, and she wanted to ensure that every possible avenue of aid was provided. However, Ms. Cowan, while meeting with the parents in February 2004, requested that Mother undergo a psychological evaluation, but Mother declined. Mother testified at trial that she refused to take the test relying on the advice of her lawyer. Accordingly, we reject Mother's contention that DCS did not make reasonable efforts by failing to provide her with a psychological evaluation.

## IV. Best Interest of the Children

We now address the final issue raised by DCS on appeal. In addition to proving by clear and convincing evidence the existence of one of the statutory grounds for termination, DCS must also prove that terminating a parent's parental rights is in the best interest of the child. Tenn. Code. Ann. § 36-1-113(c)(2) (2003). The legislature has instructed the courts to conduct a best interest analysis in a parental termination case as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2003). The trial court is not required to find that every statutory ground exists in a given case before determining that termination is in the child's best interest. *State*

*v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002).

The juvenile court found that terminating the parental rights of Mother and Father was in the best interest of the children. The record indicates that the parents have failed to adjust the conditions of the home in order to make it safe for the children to return. Tenn. Code Ann. § 36-1-113(i)(1) (2003). They have also failed to adjust the home environment despite the involvement of numerous social services agencies over a period of five years, and it does not appear that a lasting adjustment will occur in the future. Tenn. Code Ann. § 36-1-113(i)(2) (2003). While several witnesses did testify that the parents loved their children, the proof established that Mother and Father failed to appropriately interact with their children to foster their development. Ms. Billings expressed concerns that the children were not given proper stimulation by the parents to aid in their development. Tenn. Code Ann. § 36-1-113(i)(4) (2003). The testimony of the children's teachers and the counselors who interviewed the children indicates that the children have improved emotionally and academically since being removed from the custody of their parents. Tenn. Code Ann. § 36-1-113(i)(5) (2003).

Ms. Hall and Ms. Stokesberry testified about concerns that Father had sexually abused S.A.R. Ms. Iaquinta testified concerning Mother's statements of alleged sexual abuse by Father at an early age. The juvenile court also heard testimony indicating that both Father and Mother physically abused some of their children. Ms. Walters and Ms. Smith testified concerning burns to S.A.R.'s foot. Ms. Walters testified to finding a burn on S.L.R.'s arm during one visit and a cut to D.K.R.'s eye. Mr. Herman testified concerning statements made by S.R. during a therapy session concerning physical abuse inflicted by both Mother and Father. Tenn. Code Ann. § 36-1-113(i)(6) (2003). The evidence overwhelmingly showed that the physical environment of the home deteriorates to an unsafe and unsanitary level every time the children are present. Tenn. Code Ann. § 36-1-113(i)(7) (2003). Finally, we find sufficient evidence in the record to support the trial court's finding that the parent's mental and/or emotional status was detrimental to the children so as to prevent the parents from providing safe, stable care and supervision for the children. Tenn. Code Ann. § 36-1-113(i)(8) (2003). Based on our review of the entire record, we find that the evidence presented at trial supports the juvenile court's finding that termination of the Reynolds' parental rights was in the best interest of the children.

## V. Conclusion

For the reasons stated above, we affirm the juvenile court's decision to terminate the parental rights of Ronnie Reynolds and Cynthia Lynn Bradham Reynolds as to the five children involved in this case. Costs of this appeal are taxed to the Appellants, Ronnie Reynolds and Cynthia Lynn Bradham Reynolds, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE